ESTATE OF HENRY P. LAMMERTS, DECEASED, HENRY P. LAMMERTS, JR. AND HILDRED K. LAMMERTS, EXECUTORS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6819–65, 732–66—734–66. Filed March 10, 1970.

*Paul H. Reid, Jr.*, for the petitioners.
*John E. White*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Estate of Henry P. Lammerts, deceased, Henry P. Lammerts, Jr., and Hildred K. Lammerts, Executors, docket No. 732–66; Lammerts, Inc., docket No. 733–66; and Hildred K. Lammerts, docket No. 734–66.

426

**OPINION**

*Issue 1. Distribution of Assets to Petitioner; Ordinary Income or Capital Gain.*

The primary question in this case is whether the distribution by Lammerts (Old) of certain property, not transferred to Lammerts (New), resulted in ordinary income to the estate (pursuant to either section 301 [8] or section 356 [9]) or capital gain (pursuant to section 331 [10]). Respondent denies that such property was distributed pursuant to a section 331 liquidation. Instead, respondent views the several transactions before us as being no more than a continuation of Lammert (Old); or, in the alternative, as constituting a corporate re-

---

[8] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

[9] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.

(1) RECOGNITION OF GAIN.—If—

(A) section 354 or 355 would apply to an exchange but for the fact that

(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain, but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

[10] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

(a) GENERAL RULE.—

(1) COMPLETE LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

organization under section 368(a)(1)(F).[11] Each of these theories poses intriguing questions in an area of the law which is marked by uncertainty and conflict. Due to the importance which we attach to respondent's alternate contention in which he raises the question of an (F) reorganization, we will first address ourselves to this argument.

## A. Liquidation or (F) Reorganization

Though aged, section 368(a)(1)(F) has, until recently, received little administrative[12] or judicial attention. Our task here is to determine whether the case at bar falls within the narrow grasp of section 368(a)(1)(F). We do not think that it does.

Section 368(a)(1)(F) defines a reorganization as "a mere change in identity, form, or place of organization, however effected."

In Associated Machine, 48 T.C. 318 (1967), revd. 403 F. 2d 622 (C.A. 9, 1968), we stated as a principle at page 326 that the "wording of subparagraph (F) is simple and clear. 'Mere' means 'nothing more or other than.'"

In Hyman H. Berghash, 43 T.C. 743, 752 (1965), affd. 361 F. 2d 257 (C.A. 2, 1966), we made the following observation with regard to the scope of a reorganization under subparagraph (F):

> Although the exact function and scope of the (F) reorganization in the scheme of tax-deferred transactions described in section 368(a)(1) have never been clearly defined, it is apparent from the language of subparagraph (F) that it is distinguishable from the five preceding types of reorganizations as encompassing only the simplest and least significant of corporate changes. The (F)-type reorganization presumes that the surviving corporation is the same corporation as the predecessor in every respect, except for minor or technical differences. * * *

Hence, while a mere change of corporate domicile would seem to come well within the parameters of subparagraph (F), "a change which involves the retirement of some shareholders, the addition of others, a shift in the proportionate interests of those who continue, and increase in capital"[13] would seem to be outside of the literal terms of this provision.

In Berghash, the Commissioner argued that the transaction on which the Court had to pass judgment constituted an (F) reorganiza-

---

[11] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
   (a) REORGANIZATION.—
      (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

   *        *        *        *        *        *        *

      (F) a mere change in identity, form, or place of organization, however effected.
[12] See Rev. Rul. 69–185, 1969–1 C.B. 108; Rev. Rul. 69–516, I.R.B. 1969–41, 10.
[13] See Lane, "The Reincorporation Game: Have the Ground Rules Really Changed?," 77 Harv. L. Rev. 1235–1236.

tion. There the taxpayer was a retail druggist who held 99 percent of the stock of a corporation (D–B) which owned and operated a drugstore. The taxpayer and a pharmacist named Lettman, who was then in his employ, entered into a contract to establish a new drugstore corporation (D) in a prospective shopping plaza. The shopping plaza never materialized and no capital was ever paid into D until the transaction which was at issue in the case. After several unsuccessful efforts to find a new location, Lettman insisted that taxpayer sell Lettman a 50-percent share in the D–B corporation or Lettman would be forced to strike off on his own. Taxpayer agreed to the sale of 50 percent of his ownership interest in the corporation. However, since Lettman could only raise $25,000 and since the D–B corporation's assets were worth well over $100,000, taxpayer and Lettman arrived at the following plan: First, the shareholders of D–B corporation (taxpayer owning 99 percent of the outstanding shares and his wife owning 1 percent of the outstanding shares) adopted a section 331 plan of complete liquidation; second, D–B corporation transferred its operating assets to D corporation in exchange for 50 percent of D's common stock (valued at $25,000) and a negotiable promissory note for the difference between $25,000 and the value of the assets transferred; third, Lettman purchased the outstanding shares of common stock for $25,000; and fourth, D–B distributed all of its assets, including the D stock, in a complete liquidation.

In holding that the transaction did not constitute an (F) reorganization, we relied upon the following principle stated at page 752:

The decisions involving subparagraph (F) or its counterpart in prior revenue acts consistently have imposed at least one major limitation on transactions that have been claimed to qualify thereunder: *if a change in stock ownership or a shift in proprietary interest occurs, the transaction will fail to qualify as an (F) reorganization. Helvering* v. *Southwest Corp.*, 315 U.S. 194, affirming 119 F. 2d 561, affirming a Memorandum Opinion of this Court. [Emphasis supplied.]

Finally, in distinguishing *Berghash* from the facts which were presented to us in *Pridemark, Inc.*, 42 T.C. 510 (1964), affirmed in part and reversed in part 345 F. 2d 35 (C.A. 4, 1965), we made the following observation at page 754 relating to the fact that, in *Berghash*, the D corporation, once it obtained all of the operating assets of the D–B corporation, continued *in exactly the same capacity as its predecessor:*

Despite the fact that all of the operating assets were carried over to the successor corporation, which continued exactly the same business, in the same location, as had been conducted by the predecessor, the *radical shift in stock ownership* which occurred precludes us from holding that the transaction amounted to no more than "a mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)(F). *Cushman Motor Works* v. *Commissioner*, * * * [130 F. 2d 977]; *Joseph C. Gallagher*, * * * [39 T.C. 144]. [Emphasis supplied.]

Though the facts presented in the instant case do not closely parallel those which we had before us in *Berghash*, we believe the principles developed in that case are determinative of the issue herein presented.

Prior to Henry's death, Lammerts (Old) was owned exclusively by Henry and Parkinson; while subsequent to Henry's death, and prior to the distribution of assets in liquidation of the "old" corporation, Henry's estate and Parkinson held all the outstanding stock of Lammerts (Old). By contrast, Hildred and Parkinson owned all the shares of stock in Lammerts (New) with Parkinson owning all the common stock, and Hildred owning all the preferred stock. Hence, there was a marked difference in the ownership of Lammerts (Old) vis-a-vis Lammerts (New).[14]

Our finding is to be contrasted with the holding of the Second Circuit in *Bard-Parker Co.* v. *Commissioner*, 218 F. 2d 52 (C.A. 2, 1954), affirming 18 T.C. 1255 (1952), certiorari denied 349 U.S. 906 (1955), which is urged upon us by respondent. There it was held that liquidating trustees served merely as a "conduit" through which title to the assets of the transferring corporation passed to the acquiring corporation in a tax-free reorganization. The taxpayer in *Bard-Parker* contended that the transfer of the assets did not constitute a tax-free reorganization under then section 112(b) (4) [15] because: (a) In accordance with the applicable New York statute, once the old company was dissolved, title to its assets then vested in its former directors as liquidating trustees; (b) therefore, these individuals (as opposed to the old corporation) transferred the assets of the old corporation to the new corporation; and (c) the literal terms of the statute could, therefore, not be complied with since section 112(b) (4), related solely to a reorganization in which a *corporation* exchanged property for securities in another corporation. In holding that the transactions did constitute a reorganization, the Court of Appeals at pages 56–57 used

---

[14] Even if, under New York law, it could be said that Hildred and Parkinson, as specific legatees, obtained equitable title to the business assets of Lammerts (Old) upon Henry's death, Hildred did not, prior to the liquidation, have effective command over the use or disposition of these assets for purposes of the continuity-of-interest requirements so as to fall within subpar. (F). The disposition of the business assets of Lammerts (Old) was controlled by the dispositive provisions of Henry's will and accomplished by his executors. As such, we do not feel that either Parkinson or Hildred can be regarded as having stepped into the preliquidation shoes of the decedent (or his estate) so as to succeed to his former proprietary interest in Lammerts (Old).

[15] SEC. 112. RECOGNITION OF GAIN OR LOSS [I.R.C. 1939].

(b) EXCHANGES SOLELY IN KIND.—

*    *    *    *    *    *

(4) SAME.—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

the following language, part of which was quoted from *Helvering* v. *Limestone Co.*, 315 U.S. 179 (1942) :

"the separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts where they add nothing of substance to the completed affair. * * * Here they were no more than intermediate procedural devices utilized to enable the corporation to acquire all the assets of the old one pursuant to a single reorganization plan."[2] * * * [Footnote omitted.]

See also *Davant* v. *Commissioner*, 366 F. 2d 874, 884 (C.A. 5, 1966), affirming in part and reversing on other grounds 43 T.C. 540 (1965), in which the Fifth Circuit rejected an argument similar to the argument posited by the taxpayer in *Bard-Parker.*

Given the facts which we have before us, we cannot say that the separate steps which took place in this case were "integrated parts of a single scheme" in which Henry's executors merely served as conduits for the distribution of the corporation's operating assets, and should, therefore, be disregarded. In the first place, a period of approximately 3 years passed between the execution of the testamentary instrument by Henry and his demise. Secondly, the decision to liquidate and to distribute the assets of the corporation was made on the advice of counsel. Hence, the executors acted under the mandate of Henry's will only after being instructed by counsel that no other recourse was available to them. Thirdly, the decision to reincorporate was made several months after Henry's death.

With the above firmly in mind, it remains to be determined whether the shareholders of record prior to the transactions which are alleged to have constituted the (F) reorganization were predominantly the same as those persons who wound up with the proprietary interest in the corporation subsequent to such transactions. See, e.g., *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942), reversing 119 F. 2d 561 (C.A. 5, 1941), affirming a Memorandum Opinion of this Court; *Joseph C. Gallagher*, 39 T.C. 144 (1962) ; and *Hyman H. Berghash, supra.*

As stated earlier, we hold that the stock ownership in Lammerts, Inc. (Lammerts (New) ), after the transactions referred to above, was not the same as the proprietary interest in Lammerts (Old) which existed just prior to the first of these transactions, i.e., the distribution of assets to Parkinson and the estate. This is reflected by the chart which follows. As such, an (F) reorganization could not have taken place under the case law cited above.

| Ownership interest in shares (FMV) Common | Lammerts (Old) | Lammerts (New) |
|---|---|---|
| Estate (Henry) | 634 | 0 |
| Parkinson | 66 | 461 |
| Hildred | 0 | 0 |
| Preferred | | |
| Hildred | 0 | 1,498 |
| Parkinson | 0 | 0 |

Moreover, the capital structure of the new corporation was substantially different from that of the old. This is not the type of transition contemplated by the (F) reorganization framework. Again quoting from our opinion in *Berghash*, "The (F)-type reorganization presumes that the surviving corporation is the same corporation as the predecessor in every respect, expect for minor or technical differences." [16]

We hold that the transactions commencing with the distribution of Lammerts (Old) assets to its then shareholders did not collectively or independently constitute the type of occurrence contemplated by section 368(a)(1)(F).

In arriving at the above conclusion we are not unmindful of the Ninth Circuit's holdings in *Estate of Stauffer* v. *Commissioner*, 403 F. 2d 611 (C.A. 9, 1968), reversing 48 T.C. 277 (1967), and in *Associated Machine, supra;* and the Fifth Circuit's opinion in *Reef Corporation* v. *Commissioner*, 368 F. 2d 125 (C.A. 5, 1966), affirming in part and reversing in part a Memorandum Opinion of this Court. In each of these cases we held on doctrinal grounds that (F) reorganizations had not taken place and in each instance our determination was reversed on appeal with the result being an attenuation of what we thought to be the fairly narrow terms of the statute.

In *Associated Machine* we held that even though the fusion of brother-sister corporations may constitute a statutory reorganization for purposes of section 368(a)(1)(A), it did not constitute a "mere change in identity, form, or place of organization" [17] for purposes of section 368(a)(1)(F). Relying in part on the legislative history of the (F)-type reorganization and on our holding in *Hyman H. Berghash, supra*, we adopted the view that "the wording of subparagraph (F) * * * envisions a corporate rearrangement involving changes in the structure of only one corporation—a transaction where both prior to and after the reorganization there is only one corporation." [18]

In the *Stauffer* case we were presented with an issue almost identical to the (F) reorganization question presented in the *Associated Machine* case and there, too, we held that no (F) reorganization had occurred. The basis for our determination in *Stauffer* is summed up, in part, by the following language which appears at page 300 of our opinion:

Certainly, it is necessary that there be continuity of both proprietary interest and enterprise in order to qualify as an (F) reorganization. But that is not enough, for there may be other changes that are too significant to be ignored in determining whether there was a "mere change in identity, form, or place of

---

[16] See p. 430 *supra*.
[17] Sec. 368(a)(1)(F), I.R.C. 1954. See fn. 11 *supra*.
[18] 48 T.C. at 326.

organization." And in this case substantial changes did occur when the separate businesses of three separate corporations were united in a new corporation.

Relying heavily on the language of *Davant* v. *Commissioner, supra,* the Ninth Circuit reversed both cases on the general principle that where there is a shift in the operating assets from the transferor corporation to its alter ego (whether it be a viable corporation or a corporate shell) and where the identity of proprietary interest remains intact and the business enterprise of the transferor corporation continues unimpaired, an (F) reorganization has taken place.[19]

We do not believe that the above appellate court decisions detract from the conclusions we have reached in the instant proceeding. Without commenting on the overall approach used by the circuit court in these decisions, it need only be stated that in neither instance could there have been an (F) reorganization without an identity of shareholder interest. Therefore, although the above holdings of the Ninth Circuit are at loggerheads with this Court's interpretation of subparagraph (F),[20] we do not find these cases to be in conflict with the conclusions we have reached herein.[21]

*Reef Corporation* v. *Commissioner, supra,* involved a fact pattern different from the two cases discussed above. In *Reef,* the old corporation (RF) was composed of two groups of shareholders—the Butler group which owned 52 percent of the stock and the Favrot group which owned 48 percent of the stock. The Butler group was determined to buy out the Favrot group and the following plan was devised to accomplish this objective. A new corporation was formed (R) and the Butler group received all the common stock of R in exchange for a portion of their holdings in RF stock. Both groups sold the remaining RF stock to a third party (S) and each received notes of S in return. The Favrot group also received some cash. R then sold its holdings in RF stock to S for S's notes. This placed all of the stock of RF in S. S then caused RF to sell all of its assets to R in a section 337 sale. RF received R notes in the transaction which were distributed

---

[19] In *Estate of Stauffer* v. *Commissioner,* 403 F. 2d 611, *supra,* see the Court of Appeal's language at page 619 and in *Associated Machine* see the Court of Appeal's reasoning, 403 F. 2d at 625, culminating in the following language :
"*At least where there is a complete identity of shareholders and their proprietary interests, as here, we hold that the type of transaction involved is a type (F) reorganization.* * * *"
(Emphasis theirs.)

[20] In *Stauffer,* we declined to accept the holding of the Fifth Circuit in *Davant* v. *Commissioner,* 366 F. 2d 874, insofar as it permitted (F) reorganization treatment to the merger of brother-sister corporations, stating at page 303 : "With all due respect to the Court of Appeals, we do not accept its interpretation of subparagraph (F)."

[21] See Rev. Rul. 69–185, *supra* at fn. 12, which states that the Internal Revenue Service will not follow the decisions of the Court of Appeals for the Ninth Circuit in the *Stauffer* and *Associated Machine* cases, nor that portion of the Fifth Circuit's opinion in *Davant, supra,* which deals with the question of whether a combination of two or more commonly owned operating corporations can qualify as an (F)-type reorganization. Cf. Rev. Rul. 69–516, *id.*

to S in complete liquidation of RF. S then distributed the R notes pro rata to the holders of his personal notes (R, the Butler group and the Favrot group) in complete satisfaction of his personal notes. The net result of the above transactions was that the Butler group which formerly owned 52 percent of the continuing enterprise now owned a 100-percent interest. Under these facts we held that though a (D) reorganization had taken place, the changes which occurred in the proprietary interests were such that (F) reorganization treatment would not be proper.[22]

The Fifth Circuit, on cross-appeal from the Commissioner, reversed our determination with regard to this issue on the ground that (a) continuity of shareholder interest was present through the Butler group and (b) the elimination of the Favrot group's proprietary interest represented a section 302 redemption "functionally unrelated" to be (F) reorganization entered into by the Butler group.

To the extent that the circuit court in *Reef* predicated its holding on the premise that the discontinuance of the minority group's proprietary interest in R resulted from a redemption "functionally unrelated" to the transactions comprising the reorganization which was there held to have taken place, we do not feel that the *Reef* case forbids the conclusion which we have reached in the case at bar. However, to the extent that the circuit court's opinion in *Reef* can be read as being in conflict with the continuity-of-interest rules laid down in the *Berghash* [23] and *Southwest Corp.* cases, we would have to respectfully disagree with the Fifth Circuit and follow *Berghash*, which was upheld by the Second Circuit in which an appeal from this case would lie.[24]

### B. *Section 331 Liquidation or Section 301 Dividend*

Respondent's other argument is that a complete liquidation within the intendment of section 331 did not take place and that Lammerts (New) is merely a continuation of Lammerts (Old). Under respond-

---

[22] *Reef Corporation,* T.C. Memo 1965–72.

[23] In this regard, we note, without further comment, the language used by the Fifth Circuit at page 137 of the opinion:
"The Tax Court's position might have more force if the change in proprietary interests were to new persons and less than 50% of the former stockholders' interest in the old corporation remained in the new corporation. Then the change begins to look like a sale of the assets to a new and legally separate entity followed by a bona fide liquidation. * * *" (368 F. 2d at 137.)
Cf. the following language from our opinion in *Berghash:*
"* * * Berghash, who had owned all of the stock (except the two shares owned by his wife) of the old Delavan-Bailey Drug Co., Inc., wound up as the owner of only 50 percent of the stock of the successor corporation. * * * [This] radical shift in stock ownership which occurred precludes us from holding that the transaction amounted to no more than "a mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)|(F). * * *" (43 T.C. at 754.)
[24] See fn. 26 *infra.*

ent's theory the distribution of the Ramp Garage and accounts receivable not retained by Lammerts (New) would be taxable to the estate as a dividend by virtue of sections 301 and 316.[25] We do not accept respondent's theory.

In *Joseph C. Gallagher, supra,* we stated at page 157 that—

The concept of a continuation of the existing business through a section 331 liquidation,[13] coupled with an intercorporate transfer, falls into the general area of corporate reorganizations, so that it is in the so-called reorganization sections, if anywhere, that we should expect it to be dealt with. [Footnote omitted.]

This principle was reaffirmed in *Hyman Berghash, supra.*[26] We now find it apposite to the issue at hand. We have already found that a reorganization under subparagraph (F) did not take place, and since no other form of reorganization is urged by respondent, we find the language quoted from *Gallagher* to be determinative of the issue at hand. Even so, because of the complexities which inhere in this area of the law, we deem it wise to consider the various arguments raised by respondent with regard to this issue.

Respondent relies, in part, on the following language from *Davant* v. *Commissioner, supra,* in support of his argument that the transactions described above did not constitute a complete liquidation under section 331:

Clearly, this liquidation cannot come within the intention of Congress in enacting the complete liquidation provisions. Those provisions contemplate that operating assets will no longer be used by the stockholders to carry on the business as a corporation. It has long been recognized that taxpayers cannot liquidate a corporation with the intention of immediately reincorporating it in order to hold back liquid assets and cash for the purpose of getting capital gains treatment * * *. Such a liquidation reincorporation transaction does not qualify for section 331 treatment. * * * [366 F. 2d 882, 883.]

We find the facts of *Davant* to be distinguishable from those presented herein; and we do not, therefore, find the above-quoted language to be binding in the instant case. For, in *Davant* there was a

---

[25] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

[26] Note, also the opinion of the Court of Appeals in *Berghash* where our application of the *Gallagher* principle was cited with approval. 361 F. 2d at 260.

*complete* identity of shareholder interest. After the transactions there had been fully consummated, the four families who owned all the shares of stock in the transferor corporation wound up with all the shares of stock in the transferee corporation. As determined earlier in this opinion, the shareholders of Lammerts (New) were not the same as the shareholders in Lammerts (Old). Hence, we are not concerned with the kind of alleged abuse which concerned the Court of Appeals in *Davant*.

Respondent also relies upon the following language used by the Court of Appeals in *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35, 41 (C.A. 4, 1965):

> The Code provides no definition of "complete liquidation" * * * [An] indication of what distributions are meant to be accorded favored treatment is found in an early report of the Senate Finance Committee. S. Rep. No. 398, 68th Cong., 1st Sess. 12 (1924). There a distribution in complete liquidation was analogized to a sale of stock in that the shareholder "surrenders his interest in the corporation and receives money in place thereof." The corporation must have ceased to be a going corporate concern, or if the enterprise is continued in corporate form, the shareholder must have disassociated himself from it. See Regs. 1.332–2(c) (1955). * * *

We agree with the respondent that the Code provides no definition of a "complete liquidation." However, we cannot agree that the excerpt from the Senate Finance Committee report (which appears quoted above) sheds any light on either the liquidation-reincorporation area generally, or on the particular facts presented in the instant case.[27]

In this regard, we note the following language of the Court of Appeals in *Berghash*:

> The only point upon which we see any need to expand upon the Tax Court's decision is the Commissioner's argument [rejected by the Tax Court] that, if the business of the liquidated corporation is continued by the new corporation, there is no "complete liquidation" within the meaning of Sections 331 and 337. This argument, apparently derived from an early report of the Senate Finance Committee, S. Rep. No. 398, 68th Cong., 1st Sess. 12 (1924) and from Treas. Regs. § 1–332–2(c) (1955) has been accepted in a dictum by the Fourth Circuit * * * [in] Pridemark, Inc. v. Commissioner, 345 F. 2d 35, 41 (4 Cir. 1965).
> We are in complete agreement with the Tax Court's resolution of this issue;

---

[27] The phrase quoted in *Pridemark* appears in the following Senate Finance Committee's explanation of the liquidation provisions of the Revenue Act of 1924 and merely speaks of the treatment to be accorded liquidating dividends:

"The bill treats a liquidating dividend as a sale of the stock, with the result that the gain to the taxpayer is treated not as a dividend subject only to the surtax but as a gain from the sale of property which may be treated as a capital gain. The treatment of liquidating dividends under the bill is substantially the same as provided for in the Revenue Act of 1918. A liquidating dividend is, in effect, a sale by the stockholder of his stock to the corporation; he surrenders his interest in the corporation and receives money in place thereof. * * *" (S.Rept. No. 398, to accompany H.R. 6715 (Pub. L. No. 176), 68th Cong., 1st Sess., pp. 11–12 (1924).)

its interpretation reflects the normal meaning of the words "complete liquidation" in Sections 331 and 337. * * * [361 F. 2d 260.]

Nor, as respondent further argues, are we persuaded that section 1.331–1(c) of the regulations constrains us to find that a complete liquidation did not, in fact, occur in the instant case. Section 1.331–1(c) reads as follows:

(c) A liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer *may*, however, have the effect of the distribution of a dividend or of a transaction in which no loss is recognized and gain is recognized only to the extent of "other property." See sections 301 and 356. [Emphasis supplied.]

As we read section 1.331–1(c), a liquidation followed by a transfer to another corporation of all or part of the assets of the liquidating corporation *may* be denied capital gains status under section 331. However, it is our belief that the above regulations do not compel such a finding where a denial of section 331 liquidation status is not warranted by the facts. We hold on the facts presented herein that a denial of section 331 liquidation status would be unwarranted in the case at bar.

The basis for the regulations quoted above seems to be found in the legislative history of the 1954 Code. The first legislative effort intended to deal explicitly with the reincorporation problem was passed by the House in 1954, but rejected by the Senate. The Senate-House conference committee, which also rejected it, commented as follows:

The House bill in section 357 contained a provision dealing with a device whereby it has been attempted to withdraw corporate earnings at capital gains rates by distributing all the assets of a corporation in complete liquidation and promptly reincorporating the business assets. This provision gave rise to certain technical problems and it has not been retained in the bill as recommended by the accompanying conference report. It is the belief of the managers on the part of the House that, at the present time, the possibility of tax avoidance in this area is not sufficiently serious to require a special statutory provision. It is believed that this possibility can appropriately be disposed of by judicial decision *or by regulation within the framework of other provisions of the bill.*[28] [Emphasis supplied.]

Just what force should be given to the conferees' report and the regulations seemingly promulgated thereunder is somewhat unclear. *Pridemark, Inc.* v. *Commissioner, supra.* While the conference report cannot

---

[28] Conf. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 41 (1954). The House bill was initiated to shore up pre-1954 case law on reincorporations which was thought to supply inadequate protection against the bail out of corporate earnings at the capital rate. A reincorporation was subject to the provisions of the House bill if more than 50 percent of the old corporation's assets were transferred to a controlled corporation within 5 years after a liquidation, but *an exception was provided for transactions not having tax avoidance as a principal purpose.* See Bittker, Federal Income, Estate and Gift Taxation 721.

be regarded as law, it appears clear that the committee was aware of the liquidation-reincorporation problem and, nevertheless, concluded that the present statutory scheme, case law, and regulations which might be promulgated in the future were adequate to deal with it. We are in accord with this approach and at the same time we find that the regulations quoted above add little to the case law which we have already found to be not in conflict with the results we have reached.

Respondent next urges that liquidation of Lammerts (Old) did not take place for the following reasons: (a) No interruption of the automobile agency business occurred as a result of the foregoing transactions; (b) the employees of Lammerts (New) were the same persons who had been employed by Lammerts (Old); (c) the agency business telephone number was left unchanged; (d) bank account numbers and stationery were left unchanged; (e) Lammerts (Old) taxpayer identification number was left intact; (f) no notice was given to the public that the dual automobile agency was being operated under a new corporate structure; (g) only the office manager and bookkeeper were aware of the fact that a transition in ownership and management had occurred; and (h) an information return, as required by section 6043(1), was never filed with the district director's office of the Internal Revenue Service.[29]

We do not feel that, under the particular facts of this case, any of the reasons set forth above singularly or collectively militate against our decision herein. Petitioners cannot be condemned for the expeditiousness with which the transactions described herein were accomplished. The mere fact that business, under the auspices of Lammerts (New), was resumed without interruption at the termination of Lammerts (Old) does not prove that there was not, in fact, a termination of Lammerts (Old). Cf. *Hyman H. Berghash, supra.*

We recognize that Lammerts (Old) was derelict in failing to file a notice of liquidation per section 6043(1) and that Lammerts (New) was derelict in failing to obtain a new taxpayer identification number; however, we cannot see how either of these failures may be construed to prevent liquidation status under section 331.

Lastly, respondent has stated on brief that:

If respondent is incorrect and an estate that causes a corporation to go through a purely formal liquidation qualifies automatically under section 331, then "a new horizon of tax avoidance possibilities would be opened." * * * For if respondent loses this case, a rush of new codicils may naturally be expected.

In response to this contention, we note that it was the direction of Henry's will which caused the executors of Henry's estate to liquidate Lammerts. It was not an act of their own volition which brought about

---

[29] See fn. 7 *supra.*

the liquidation. Assuming *arguendo* that respondent is correct in his fear, we would not be justified in altering our conclusions merely because a taxpayer, in a given set of circumstances, experiences favorable income tax consequences. Quoting, in part, language cited by the Court of Appeals in *Lewis* v. *Commissioner*, 176 F. 2d 648, "Our determination of the substantive question must not be controlled by whether in the particular case it is to the advantage of the Government or of the taxpayer" to hold that a section 331 liquidation has been effected. "Rather, the effort should be to seek out the true intendment of the law, [and] let the chips fall how they may in the particular litigation. Otherwise, to change the metaphor, interpretative chickens may come home to roost at a time when the barnyard wears quite a different aspect." 176 F. 2d at 648.

### *Issue 2. Redemption of Preferred Stock*

On December 15, 1962, a special meeting of the stockholders of Lammerts (New) was held. Present at that meeting were Hildred, Parkinson, and Paul H. Reid, Jr., the petitioners' attorney. The following is an excerpt from the minutes of that meeting:

A general review of the business operations for the year 1962 was had and a discussion was had relative to the preferred stock of the Corporation. It was unanimously agreed that it would be in the best interest of the Corporation that such preferred stock be retired in part.

As a result, Lammerts (New) redeemed 180 shares of its 6-percent noncumulative, nonvoting preferred stock from Hildred for $18,000 (its book value).[30] During the year 1962, Lammerts (New) reported a taxable income of $25,714.12. No dividends were paid on the preferred shares by Lammerts (New) during the year 1962.

Respondent contends that redemption of the 180 shares of preferred stock referred to above was essentially equivalent to a dividend under section 302 and subject to ordinary-income tax rates under section 301.[31] we agree with respondent.

The problem of determining whether a redemption of stock should be treated as an exchange (pursuant to section 302) or a distribution (pursuant to section 301) is indeed a vexing one.[32] The burden of proof

---

[30] Immediately before this redemption, Hildred owned 1,498 shares of the preferred stock of Lammerts (New), these being all of the outstanding preferred shares. Parkinson owned 461 shares of the common stock of Lammerts (New), these being all of the outstanding common shares.

[31] Sec. 301(a), see fn. 8 *supra*.

SEC. 301. DISTRIBUTIONS OF PROPERTY.

    (c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

        (1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[32] See Moore, "Dividend Equivalency—Taxation of Distributions in Redemption of Stock," 19 Tax L. Rev. 249 (1964).

on this issue rests with petitioner. Petitioner concedes, in its reply brief, that the redemption of Hildred's shares does not fit within either of the specific safe-harbor tests of section 302(b) (2) and (3)[33] which, if met, would require capital gains treatment. Petitioner, however, contends that the distribution was not essentially equivalent to a dividend under section 302(b) (1).[34] We hold that petitioner has failed to meet its burden of proof with regard to this question and that the redemption of Hildred's shares was essentially equivalent to a dividend.

The regulations under section 302, in pertinent part, contain the following statements:

Sec. 1.302–2. Redemptions not taxable as dividends.

(a) The fact that a redemption fails to meet the requirements of paragraph (2), (3) or (4) of section 302(b) shall not be taken into account in determining whether the redemption is not essentially equivalent to a dividend under section 302(b) (1). See, however, paragraph (b) of this section. For example, if a shareholder owns only nonvoting stock of a corporation which is not section 306 stock and which is limited and preferred as to dividends and in liquidation, and one-half of such stock is redeemed, the distribution will ordinarily meet the requirements of paragraph (1) of section 302(b) but will not meet the requirements of paragraph (2), (3) or (4) of such section. * * *

---

[33] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) LIMITATION.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

(C) DEFINITIONS.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

(D) SERIES OF REDEMPTIONS.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

[34] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(b) The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b) (1) depends upon the facts and circumstances of each case. One of the facts to be considered in making this determination is the constructive stock ownership of such shareholder under section 318(a). * * *

Two distinct inferences may be drawn from the above language: The first being that a redemption of nonvoting, non-306 preferred stock from a person owning only preferred stock will ordinarily, but not necessarily, meet the requirements of section 302(b) (1) ; [35] and, the second being that the analysis of any transaction alleged to fit within section 302(b) (1), including the example cited in section 1.302–2(a) of the regulations, must take into consideration the constructive-ownership rules of section 318.[36] See, e.g., *Levin* v. *Commissioner*, 385 F. 2d 521 (C.A. 2, 1967), affirming 47 T.C. 258 (1966) ; and *Thomas G. Lewis*, 35 T.C. 71 (1960). Petitioner has not argued to the contrary.

It is our conclusion that the application of the attribution rules of section 318(a) (1) (A) (ii) [37] to the facts of this case precludes us from holding that the redemption of Hildred's shares of preferred stock was not essentially equivalent to a dividend. As we stated in *Perry S. Lewis*, 47 T.C. 129, 134 (1966), "We think that the indispensable first step in determining dividend equivalency is whether the redemption

---

[35] The example illustrated in sec. 1.302–2(a), Income Tax Regs., is apparently derived from the legislative history of sec. 302. As originally passed by the House, sec. 302 did not contain the "not essentially equivalent to a dividend" test. The Senate Finance Committee felt that without such a test, sec. 302 would be unnecessarily restrictive. As a result the Senate Finance Committee added sec. 302(b)(1) and explained this addition as follows :

"While the House bill set forth definite conditions under which stock may be redeemed at capital-gain rates, these rules appeared unnecessarily restrictive, particularly in the case of redemptions of preferred stock which might be called by the corporation without the shareholder having any control over when the redemption may take place. Accordingly, your committee follows existing law by reinserting the general language indicating that a redemption shall be treated as a distribution in part or full payment in exchange for stock if the redemption is not essentially equivalent to a dividend. * * * [S.Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 44–45 (1954).]"

[36] Sec. 318(b) (1) states as follows :
(b) Cross References.—
For provisions to which the rules contained in subsection (a) apply, see—
(1) section 302 (relating to redemption of stock) ;
Sec. 302(c) states as follows :
(c) Constructive Ownership of Stock.—
(1) In General.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.

[37] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.
(a) General Rule.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—
(1) Members of Family.—
(A) In general.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

*        *        *        *        *        *        *

(ii) his children, grandchildren, and parents.

of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders." (Quotation marks and brackets omitted.) In the instant case, the redemption of the 180 shares of Hildred's preferred stock created no change in her relationship to either Lammerts (New) or her son, Parkinson. Both before and after the redemption she owned directly 100 percent of the outstanding shares of Lammerts (New) preferred and constructively 100 percent of Lammerts (New) common since her son, Parkinson, owned directly all the outstanding common stock. Moreover, Hildred's relationship to the corporation was not significantly changed by virtue of the redemption. Neither before nor after the redemption did she take an active role in the management of the corporation. Hence, the facts of this case are distinguishable from *Perry S. Lewis, supra*, the only case relied upon by petitioners. In *Lewis*, the redemption of the shares of stock held by the taxpayer was in conjunction with an overall plan whereby the taxpayer relinquished his duties as president and completely terminated his active role as an officer and director of the corporation. Under these circumstances, we found that the taxpayer's desire to withdraw from both the ownership and management of the business constituted a change in position sufficient to "dispel the aura of dividend equivalence." 47 T.C. at 135. We find no such change of position in the case at bar.

In arriving at the above determination we do not deny that Hildred experienced some change in the ownership rights attached to her preferred shares, to wit, participation in current earnings and the right to corporate assets on liquidation. However, on the facts of this case, we do not feel that these changes weigh heavily enough to alter our determination of dividend equivalency. Compare *Himmel* v. *Commissioner*, 338 F. 2d 815 (C.A. 2, 1964), reversing 41 T.C. 62 (1963), distinguishable on its facts, in which relative changes with respect to ownership attributes of preferred stock (i.e., rights to earnings and assets) were considered by the Court of Appeals in arriving at its determination of nondividend equivalency.

The redemption of Hildred's shares came at the heels of a profitable year for Lammerts (New) during which its current earnings and profits exceeded the $18,000 paid to Hildred for her preferred shares. In light of the "aura of dividend equivalence" suggested by these factors we believe that, in order to find for petitioners, there would have to be present in this case "some raison d'être for the redemption reasonably related to business exigencies and not founded upon the personal whims of the taxpayer or, * * * upon the machinations of other shareholders whose shares would be attributable to [her]." 47 T.C. at 134. Cf. *Northup* v. *United States*, 240 F. 2d 304 (C.A. 2, 1957), reversing

a District Court case. In the instant case, no business purpose for the redemption is urged by petitioners.

Finally, in light of the fact that we have treated Hildred as constructive owner of 100 percent of the common stock of Lammerts (New), we believe the so-called net-effect test, under which dividend equivalency is determined by comparing the economic effect of a hypothetical dividend to that of the actual distribution in redemption of preferred shares, has no application to the facts of this case.[38]

### Issue 3. Penalty for Late Filing

Petitioners (in this instance, the Estate of Henry Lammerts) contend that the late filing of the fiduciary income tax return for the estate was due to reasonable cause, within the meaning of section 6651(a),[39] since the executors of the estate relied upon DeLyden, their long-time accountant, and Paul H. Reid, Jr., attorney to the estate, to file all necessary tax returns. Petitioners also contend that the failure of the executors to file on time should be excused since neither Parkinson nor Hildred had previously acted as executors of an estate and were unaware of the necessity of filing a fiduciary income tax return.

The regulations under section 6651(a) defined reasonable cause in accordance with the following standard: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Sec. 301.6651–1(a)(3), Proced. & Admin. Regs. For a similar definition, see *George S. Van Schaick, Supt. of Insurance*, 32 B.T.A. 736, 744 (1935).

Petitioner has the burden of showing that failure to file the required return was due to reasonable cause. *Wm. J. Lemp Brewing Co.*, 18 T.C. 586 (1952). Moreover, it is well established that ignorance of the necessity for filing a tax return will not of itself relieve a taxpayer of the 6651(a) penalty. *Frank Souza*, 33 T.C. 817 (1960); *Logan Lumber Co. v. Commissioner*, 365 F. 2d 846 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; *Haywood Lumber & Mining Co.*, 12 T.C. 735 (1949), reversed on other grounds 178 F. 2d 769

---

[38] For a recent discussion of the principles underlying the "net effect test," see *Commissioner* v. *Estate of Antrim*, 395 F. 2d 430 (C.A. 4, 1968), affirming a Memorandum Opinion of this Court.

[39] SEC. 6651. FAILURE TO FILE TAX RETURN.

(a) ADDITION TO THE TAX.—In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

(C.A. 2, 1950). In the instant case, the estate cannot be relieved of its obligation to timely file a fiduciary income tax return simply because the executors of the estate had never before acted in such capacity and were unaware of the duties incumbent upon them, one of which was the filing of a fiduciary income tax return.

Parkinson, as the executor of the estate and as the person who apparently assumed responsibility for such estate matters as the preparation of tax returns, had a positive duty to ascertain the nature of his responsibilities as such. The fact that he, in good faith, believed that he had done all that was required of him when the estate tax return was filed is not an excusable circumstance. See, e.g., *Fides, A.G.,* v. *Commissioner,* 137 F. 2d 731 (C.A. 4, 1943), affirming 47 B.T.A. 280 (1942), certiorari denied 320 U.S. 797 (1943). In failing to ascertain his obligations as executor, Parkinson's conduct was in our estimation neither "ordinary" nor "prudent." See sec. 301.6651–1(a)(3), Proced. & Admin. Regs., *supra.* Inasmuch as both Parkinson and Hildred were unfamiliar with the duties and responsibilities incumbent upon them as executors, at least one of them should have sought advice from either DeLyden or Reid as to what Federal tax returns were required of the estate. The record contains not even the slightest hint that either of the executors sought such advice.

Nor are we persuaded by petitioner's contention that the executors of the estate reasonably relied upon Reid and DeLyden for preparation of the fiduciary income tax return required of the estate. DeLyden testified that most of his work for the Lammerts family and the Lammerts corporations had to do with repeat returns and that he did not think that his offices would be called upon to prepare the fiduciary income tax return. Moreover, the books and records of the estate were maintained in Reid's office. Parkinson and DeLyden never even discussed estate matters. Under these circumstances, any belief on the part of Parkinson that DeLyden would handle the preparation of all tax returns affecting the estate cannot be regarded as reasonable.

Lastly, petitioners may not escape responsibility under 6651(a) by attempting to show reliance on Reid. It is true that under some circumstances it has been held that reliance by a taxpayer upon professional advice may constitute reasonable cause for failure to comply with the law. However, in such cases the matter involved must be "complicated and unusual, justifying such reliance." *R. A. Bryan,* 32 T.C. 104, 133 (1959). In the case at bar, by contrast, the necessity of filing a fiduciary income tax return represented a duty basic to the administration of Henry's estate. All Parkinson had to do to ascertain the nature of this duty was to ask Reid what he (Parkinson), as executor of his father's estate, was obligated to do in order to fully satisfy his fiduciary obligation. He failed to do this.

Granted that Parkinson's inadvertence was probably predicated upon his mistaken (though unwarranted) belief that DeLyden would prepare all tax returns required of the estate; however, no basis whatsoever existed which might have glossed this belief with a coating of reasonableness since DeLyden was not even supplied with the books and records of the estate until after it was discovered that the return had been overlooked.

Under these facts, petitioners' reliance on the *Haywood Lumber & Mining Co.* case is misguided since in the *Haywood* case, unlike the instant proceeding, petitioners' accountant was supplied with all the necessary information for the preparation of the return in question and was specifically requested to prepare it.

To reflect the concessions made by the parties and the conclusions reached herein,

> *Decisions will be entered under Rule 50 in docket Nos. 6819–65, 732–66, and 733–66.*
>
> *Decision will be entered for the respondent in docket No. 734–66.*

Reviewed by the Court.

RAUM, *J.*, dissents.

---

TANNENWALD, *J.*, dissenting in part: As I read the majority opinion, it embraces the thesis that a distribution, which is in form accomplished as part of a complete liquidation, must be treated as a section 331 distribution unless the entire transaction can be fitted within the definition of a reorganization contained in section 368(a). My brother Sterrett lends credence to this analysis by focusing upon the reorganization provisions and struggling with the technical obstacles with which those provisions abound. The net result is to escalate one prong of *Joseph C. Gallagher*, 39 T.C. 144 (1962), and *Hyman H. Berghash*, 43 T.C. 743 (1965), affd. 361 F. 2d 257 (C.A. 2, 1966), from the level of a distinguishable rationale to a mandated doctrine of wide application. I would have thought that the "form versus substance" criteria (cf. *Bazley* v. *Commissioner*, 331 U.S. 737 (1947)) with which the decided cases abound, would have been more than sufficient to preclude such supine acceptance of the tyranny of labels and to support the conclusion that no liquidation of Lammerts (Old) occurred herein.[1]

---

[1] The liquidation–reincorporation area is a prickly thicket through which the courts, the respondent, and even the Congress, have traveled only with considerable difficulty. See, e.g., Wood, "A Proposed Treatment of Reincorporation Transactions," 25 Tax L. Rev. 282 (1970) ; Pugh, "The F Reorganization ; Reveille for a Sleeping Giant?," 24 Tax L. Rev. 437, 453–456 (1969) ; Whitaker, "Liquidation and Reincorporation," 18th U. 'So. Calif. Tax Inst. 191 (1966) ; Lane, "The Reincorporation Game : Have the Ground Rules Really Changed?," 77 Harv. L. Rev. 1218 (1964).

Let us assume that Henry P. Lammerts had, prior to his death, caused the liquidation of Lammerts (Old) and, after retaining the accounts receivable, loan to shareholder, and Ramp Garage property (hereinafter referred to as the specified assets or the retained specified assets), joined in the immediate transfer of his share of the operating assets of the automobile agency to Lammerts (New) in exchange for the appropriate amount of preferred and common stock. I doubt whether anyone would seriously question that he would have realized dividend income in the full amount of the value of the retained assets. Similarly, if Henry P. Lammerts had in his will divided his common stock in Lammerts (Old) between his widow and his son and, upon distribution of the common stock in accordance with those directions, the widow and the son had accomplished the liquidation and reincorporation exchange, with the widow retaining the specified assets, the widow would also clearly have realized a comparable amount of dividend income. Finally, if Henry P. Lammerts had directed his executors to accomplish both the liquidation and the reincorporation exchange and then to distribute the retained specified assets and the preferred stock of Lammerts (New) to his widow and the common stock to his son, the estate would have been properly charged with the same amount of dividend income. This case simply involves the question whether the retained assets should escape the characterization of dividend income simply because, pursuant to a preconceived plan, which was promptly implemented upon the death of Henry P. Lammerts, the liquidation and reincorporation stages are handled separately—the liquidation by the estate and the reincorporation by the widow and the son. I think a negative answer to that question is clearly indicated.

I am aware of the concept—which is not without its troublesome aspects—that shareholder as well as corporate purposes may legitimatize various types of corporate readjustments. See *Parshelsky's Estate* v. *Commissioner*, 303 F. 2d 14, 21 (C.A. 2, 1962), reversing 34 T.C. 946 (1960) ; *Ballenger* v. *United States*, 301 F. 2d 192, 198 (C.A. 4, 1962). But I need not tarry along this path, for the record is devoid of any probative evidence which could cause us to hold that there was any raison d'être, aside from tax considerations, for the liquidation of Lammerts (Old) and the retention of the specified assets. Compare *Helvering* v. *Elkhorn Coal Co.*, 95 F. 2d 732 (C.A. 4, 1937).

I recognize, of course, that the absence of a "business purpose," developed for application in the corporate reorganization area by *Gregory* v. *Helvering*, 293 U.S. 465 (1935), does not automatically destroy the tax validity of a corporate liquidation. A liquidation can be motivated solely by tax considerations and still be clearly valid (see *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455

(1950) ) )—e.g., the liquidation of a corporate business and its subsequent operation as a partnership or sole proprietorship. But this does not mean that a purely technical liquidation must always be recognized for tax purposes.[2] *The liquidation must still have reality and substance as a liquidation* and it is here that petitioners' case falls apart.

Amounts received on liquidations are treated as the proceeds of an "exchange" only because section 331 says they should be. Indeed, in the early years of the income tax, liquidating distributions were treated as dividends subject to ordinary tax and not as capital gains. H. Rept. No. 179, 68th Cong., 1st Sess., pp. 11–12 (1924) ; S. Rept. No. 398, 68th Cong., 1st Sess., pp. 11–12 (1924) ; H. Rept. No. 844, 68th Cong., 1st Sess., p. 14 (1924). Congress analogized a liquidation to a sale or exchange because it felt that a significant transmutation occurred in the shareholder's interest. *Davant v. Commissioner*, 366 F. 2d 874, 882 (C.A. 5, 1966), modifying 43 T.C. 540 (1965) ; *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35, 41 (C.A. 4, 1965), reversing 42 T.C. 510 (1964). See S. Rept. No. 398, *supra.* Where a corporation is liquidated and its business continued in noncorporate form, there is validity to that analogy. And where the business of the new corporation differs substantially from that of the old, the analogy is equally valid. See *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d at 41; *Standard Realization Co.*, 10 T.C. 708, 714–715 (1948). Similarly, the analogy remains where there is a significant change of ownership, although it can become strained where there is a continuity of ownership, albeit somewhat reduced, on the part of a shareholder who retains some of the assets. See *Joseph C. Gallagher*, 39 T.C. 144 (1962). But where a formal liquidation is followed *instanter* by a prearranged reincorporation of the very same business with the very same owners, the analogy fails completely. See *Davant v. Commissioner*, 366 F. 2d at 882. Compare also the contrasting of "genuine liquidation" with "going concern" in *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. at 454–455.

The majority does not deny that there was well-nigh perfect continuity of business and, in fact, details the many respects in which the business continued without a break. The only element of business discontinuity was the lapse in the General Motors dealership. But that lapse was solely in consequence of Henry's death and would have occurred whether or not the liquidation-reincorporation took place.

---

[2] Technical liquidations utilized as a means of effecting a reorganization, e.g., *Morley Cypress Trust, Schedule "B"*, 3 T.C. 84 (1944), stand on an entirely different footing with respect to sec. 331. Since such a liquidation draws business significance from the reorganization of which it is part, a purely formal liquidation may satisfy sec. 331 and make the transaction an "exchange" as required by secs. 354 and 356(a).

The problem lies with continuity of ownership. After Henry's death, the stock of Lammerts (Old) was technically vested in Henry's estate. By way of contrast, the stock of Lammerts (New) was acquired by Hildred and Parkinson. Thus, continuity of ownership can be established only by viewing the estate as a mere conduit for Hildred's and Parkinson's ownership. I think that this is justifiable.[3] It is actual ownership, and not formal title to the corporate stock, which is important in determining continuity of interest in a corporation. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942). Under the will, Hildred and Parkinson were the sole successors to Henry's interest in the corporation, and so I think that they should be regarded as in substance the owners of Lammerts (Old), especially in view of the fact that they were sole executors of the estate.[4] True, Henry's will directed the formal liquidation of Lammerts (Old), so that the legatees' rights were to the corporate assets rather than to the corporate stock. But it is precisely the ownership of the corporate assets which is significant, not formal ownership of the corporate shell. In *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra*, the creditors of the old corporation had no right (as creditors) to the stock of the old corporation, only to its assets: yet the Court found continuity.

There is thus complete continuity of ownership, as well as complete continuity of business, between Lammerts (Old) and Lammerts (New). What Hildred and Parkinson had before the liquidation is virtually identical to what they had after the reincorporation. Of course, Hildred's interest in Lammerts (Old) consisted of an interest in an estate which owned common stock in that corporation. Her interest in Lammerts (New) consisted of the direct ownership of preferred stock. I do not regard this difference as great enough to cause any analogy to a sale or exchange to be appropriate.[5] Compare *Easson* v. *Commissioner*, 294 F. 2d 653, 660 (C.A. 9, 1961).

There are numerous examples where the courts have imposed a judicial gloss on the words of provisions of the Internal Revenue Code dealing with the use of the corporate form to bring about readjust-

---

[3] I realize that this line of reasoning may cast doubt upon the liability of the estate for the tax on the dividend represented by the retained specified assets. But petitioners have not raised this issue, even alternatively, and consequently we need not concern ourselves with this aspect of the case.

[4] *Survaunt* v. *Commissioner*, 162 F. 2d 753, 757 (C.A. 8, 1947), affirming 5 T.C. 665 (1945), is clearly distinguishable. In that case, the Court of Appeals emphasized that the transfer to the widow was not part of the plan and in fact took place more than a year after the decedent's death and more than 7 months after the transfer of assets to the new corporation.

[5] My rationale is based upon the merger of the technical title of the estate into the actual ownership of Hildred and Parkinson and not upon a recognition of actual ownership by the former and the attribution thereof to the latter. I recognize that the statutory attribution rules are not applicable to reorganizations. See *Hyman H. Berghash*, 43 T.C. 743, 757 (1965).

ments in business enterprises. Thus, in the reorganization area, the doctrines of "continuity of interest" and "business purpose" have long been accepted tools for decision. E.g., *Pinellas Ice Co.* v. *Commissioner*, 287 U.S. 462 (1933); *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra; Gregory* v. *Helvering*, 293 U.S. 465 (1935). The "continuity of business enterprise" thesis in the area of carryovers of net operating losses is another example. E.g., *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, 386 (1957). A further illustration can be found in cases examining the question whether a transfer of assets to a corporation is a sale for a corporate evidence of indebtedness entitled to capital gain treatment or a tax-free exchange under section 351. Compare, e.g., *Burr Oaks Corp.*, 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966), with *Charles E. Curry*, 43 T.C. 667 (1965). Similarly, the courts have on occasion refused to characterize a distribution in kind by a corporation which continues in business as a liquidating dividend when it is immediately disposed of by the recipient shareholder. See cases collected in *Waltham Netoco Theatres, Inc.*, 49 T.C. 399, 405 (1968), affd. 401 F. 2d 333 (C.A. 1, 1968). We ought not to flinch from importing a comparable judicial gloss into section 331 in order to reject petitioners' contentions herein. Our obligation to do so is reinforced by the express concern of Congress over problems in the liquidation-reincorporation area and its confidence that those problems could be dealt with "by judicial decision or by regulation within the framework of the other provisions" of the 1954 Code. See H. Rept. No. 2543, 83d Cong., 2d Sess., p. 41 (1954). The respondent has sought to justify that confidence (see secs. 1.301–1(1) and 1.331–1(c), Income Tax Regs.) and we should be no less forthright where there is sufficient flexibility to permit us to act.

The fact that Henry's will directed the liquidation does not require a different conclusion. The testamentary provision was no more than the directive, albeit a posthumous one, of a controlling stockholder. To say that the executors were legally bound to obey, and hence did not act of their own volition, is to say no more than that the liquidation was an integral part of a preconceived plan and to confirm the mutual interdependence of the various steps of the transaction.

The liquidation and reincorporation were merely steps in a preconceived plan. They added nothing to the final result and may therefore be disregarded. Cf. *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. at 184–185. Under the plan, the business assets were to be out of the corporate solution and in the hands of Hildred and Parkinson only in a technical legal sense and only for a fleeting moment. The fact that Hildred and Parkinson received undivided interests in a unified business provides objective support for this conclusion. In short,

both the liquidation and the reincorporation were meaningless events in the accomplishment of the transaction and can be disregarded for tax purposes. Cf. *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609 (1938); *Helvering* v. *Bashford*, 302 U.S. 454 (1938); *Casco Products Corp.*, 49 T.C. 32 (1967); *William F. Wolf, Jr.*, 43 T.C. 652 (1965), affd. 357 F. 2d 483 (C.A. 9, 1966). "A given result at the end of a straight path is not made a different result because reached by following a devious path." See *Minnesota Tea Co.* v. *Helvering*, 302 U.S. at 613.

I would hold that there was no liquidation within the meaning of section 331. See *Davant* v. *Commissioner*, 366 F. 2d at 882–883; *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d at 41. Consequently, the distributions involved herein cannot be treated as received in an "exchange" under section 331 and therefore cannot receive capital treatment. No other section of the Code specifically requires the recognition of a liquidation for tax purposes. Of course, the general language of section 61 might require the recognition of a merely technical liquidation as a taxable event. But I have concluded that it does not, for much the same reasons that I have concluded that the transaction was outside section 331.

Neither *Joseph C. Gallagher, supra,* nor *Hyman H. Berghash*, 43 T.C. 743 (1965), affd. 361 F. 2d 257 (C.A. 2, 1966), forecloses this result. Admittedly, there is unfavorable language in those opinions which leaves "room for some skepticism." [6] See *Simon* v. *United States*, 402 F. 2d 272, 277 (Ct. Cl. 1968). But both cases involved facts quite different from those now before us. In *Gallagher*, a substantial (38.05 percent) minority interest left the corporate enterprise, and a substantial (27⅓ percent) new minority interest took its place in the successor corporation. And in *Hyman H. Berghash, supra,* half of the stock of the new corporation was owned by a new investor.[7] In both cases, therefore, there was a  meaningful change in the ownership, so that the successor corporation could not easily be equated to the predecessor corporation.

Since Lammerts (Old) and Lammerts (New) are to be regarded as the same corporation, the receipt of the retained specified assets constitutes as distribution with respect to stock under section 301. It is perhaps arguable that what occurred was a redemption of part of the stock of Lammerts (Old) for those assets. Compare *Casco Products Corp., supra.* See sec. 317 (b). But, even so, section 302 (d) would make

---

[6] I think that the majority has misinterpreted the language it quotes from *Gallagher*, 39 T.C. at 157. I read that language to say that if there is a *valid* liquidation, the resulting "exchange" must necessarily be treated as a capital transaction unless it is incident to a reorganization.

[7] The parties stipulated that a "complete liquidation" had taken place, and this may have played some part in the decision. See *Hyman H. Berghash*, 43 T.C. 743, 759 (1965).

section 301 applicable. Obviously, neither subsection (b)(2) nor (b)(3) of section 302 would apply, especially in light of the attribution rules of section 318. As a result, there would appear to be no basis for considering the distribution as not being "essentially equivalent to a dividend."

As far as the presence of a reorganization is concerned, I agree that there was not a "mere change in identity, form, or place of organization" so as to constitute an (F) reorganization for the reasons set forth in the majority opinion. I also have great difficulty in finding a (D) reorganization, because this requires accepting the premise that the existence of two corporations should be recognized. Such a holding also involves, as my brother Sterrett's opinion reveals, adopting a dichotomous approach that, on one hand, the entire transaction was "integrated" in order to find a reorganization but that, on the other hand, the distribution and retention of the specified assets were "functionally unrelated" to the reorganization in order to deal with the limitations of the boot provisions of section 356(a) due to the stepped-up basis attendant upon Henry's death and thus bring the distribution under section 301. See Whitaker, fn. 1, *supra*. The difficulties arising from the dichotomous approach would, of course, also be present in a holding that there was an (E) reorganization. I also note that there is serious doubt as to whether the record herein would sustain a finding of the required "business purpose" and, in any event, no argument based upon this type of reorganization was made by the parties herein.

SIMPSON, *J.*, agrees with this dissent.

----

STERRETT, *J.*, dissenting: I respectfully disagree with the majority's view of the tax consequences flowing from the liquidation-reincorporation transaction involved in issue one of the case at bar.

In my opinion, it ignores the realities of the situation to say that during the period between Henry's death (June 15, 1961) and the liquidation of Lammerts (Old) (January 2, 1962) it was the estate, rather than Hildred and Parkinson, which had a proprietary interest in the 634 shares of Lammerts (Old) previously owned by Henry. To the contrary, the facts reveal that Hildred and Parkinson were co-executors of the estate and consequently, held legal title to the stock of Lammerts (Old) with full power to vote such stock. In addition, as the sole beneficiaries of the estate, insofar as the assets of Lammerts (Old) were concerned, Hildred and Parkinson were the beneficial owners of that stock. Thus, Hildred and Parkinson held both the legal and equitable interests of the Lammerts (Old) stock, giving them complete dominion and control over the assets of the corporation.

In light of the foregoing, I would revise the majority's chart reflecting the various preliquidation and postliquidation ownership interests in Lammerts, Inc., to set forth the facts more realistically, as follows:

| Ownership interest in shares Common | Lammerts (Old) | (New) |
| --- | --- | --- |
| Estate (Hildred and Parkinson) | 634 | 0 |
| Parkinson | 66 | 461 |
| *Preferred* | | |
| Hildred | 0 | 1,498 |

When the transaction is viewed in this posture, it can be seen that there was continuity of proprietary interest throughout, i.e., both Hildred and Parkinson had an ownership interest in Lammerts, Inc., before and after the liquidation-reincorporation transaction.

Furthermore, continuity of business enterprise is present in the transaction at issue. With the exception of certain accounts receivable, a loan to shareholders, and the Ramp Garage property, the assets of Lammerts (Old) remained in corporate solution following their transfer to the new corporate shell. Indeed, all of the *operating* assets of Lammerts (Old) were transferred to Lammerts (New) and that corporation without interruption continued to carry on exactly the same business which had previously been conducted by Lammerts (Old).

Finally, I have been unable to discern any valid business purpose for the complete liquidation of Lammerts (Old). Section 331 was intended by Congress to be used on the occasion of a corporation terminating its business. *Davant* v. *Commissioner*, 366 F. 2d 874, 882–883 (C.A. 5, 1966), affirming in part and reversing on other grounds 43 T.C. 540 (1965). However, as noted earlier, such a termination did not occur, but instead, the operating assets of Lammerts (Old) were reincorporated in Lammerts (New) and used to carry on the same business.

I am therefore compelled to the conclusion that the liquidation in and of itself had no independent validity, but instead, was one step in a series of integrated steps in a unitary plan which resulted in Lammerts (New) receiving a stepped-up basis in the assets received from Lammerts (Old). In a simultaneous but functionally unrelated transaction (which will be more fully discussed later), the Ramp Garage, the accounts receivable, and the shareholder loan were siphoned off in a distribution which petitioners contend should be taxable at the favorable capital gains rates.

That the reincorporation of the operating assets of Lammerts (Old) was foreordained is apparent for several reasons. First, Parkinson and Hildred went out of their way to retain the name Lammerts, Inc., for the new corporate shell by changing the name of Lammerts (Old) to

Lammerts Associates, Inc., on the same day that they filed a certificate of incorporation for Lammerts (New) under the name of Lammerts, Inc. Second, G.M.'s direct dealer selling agreement before the liquidation-reincorporation was with *Lammerts, Inc.*, and the one executed on May 2, 1962, after the transaction, was similarly with *Lammerts, Inc.* The expiration date of both agreements was the same, October 31, 1965, and all other provisions were identical except for the elimination of the name of Henry P. Lammerts as a participant in ownership and operation. Thus, a highly desirable degree of continuity for business, goodwill, and contractual relationship purposes was maintained. Third, the high risks of tort or breach of contract claims inherent in the automobile dealership business certainly made it prudent, if not mandatory, for the business to be operated within a corporate shell.

For the foregoing reasons, I believe that the liquidation-reincorporation transaction would more properly be treated within the scope of the reorganization provisions of the 1954 Code. There is ample authority wherein this Court has deemed it appropriate to collapse the liquidation-reincorporation steps thereby treating the arrangement as a unitary plan of reorganization. *James Armour, Inc.*, 43 T.C. 295, 309–310 (1964); *John G. Moffatt*, 42 T.C. 558, 575 (1964), affd. 363 F. 2d 262 (C.A. 9, 1966), and the cases cited therein. See also sec. 1.331–1(c), Income Tax Regs.

Indeed, the instant transaction aptly fits the mold of a "reorganization" as defined in section 368(a)(1)(D). That section describes a (D) reorganization as "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders * * * is in control of the corporation to which the assets are transferred." All of the requisite elements of this definition are fulfilled in the instant case. Lammerts (Old) transferred substantially all of its assets to Lammerts (New), and immediately thereafter, Hildred and Parkinson, who were shareholders of the transferor, were in "control" of the transferee, Lammerts (New). "Control" is defined in section 368(c) to mean ownership of 80 percent of all classes of both voting and nonvoting stock of the corporation. In this case, Hildred and Parkinson, taken together, owned 100 percent of all the common and preferred stock of Lammerts (New).

Section 368(a)(1)(D) further provides that a transaction comes within its terms "only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355 [section 355 is not applicable to this case], or 356." The transaction at issue does

qualify for treatment under section 354. Disregarding the intermediate steps and viewing the transaction as a whole, it is clear that in substance there was an exchange by Hildred and Parkinson of stock in Lammerts (Old) for stock in Lammerts (New) as required by section 354(a)(1). *John G. Moffatt, supra* at 577. Moreover, Lammerts (Old) transferred "substantially all" of its assets to Lammerts (New) pursuant to a unitary plan of reorganization within the intendment of section 354(b)(1)(A) and (B). Thus, I would hold that the liquidation-reincorporation transaction qualifies as a tax-free reorganization within the definitional provisions of section 368(a)(1)(D) and the operative provisions of section 354. As a result, the basis of the transferred assets in the hands of Lammerts (New) would be the same basis that the assets had in the hands of Lammerts (Old). See sec. 362(b), I.R.C. 1954.

Alternatively, this transaction could well be viewed as an (E) reorganization based upon the reshuffling of the capital structure of Lammerts, Inc. Hildred entered the transaction with a majority interest in the common stock of Lammerts (Old) and emerged owning 100 percent of the preferred stock of Lammerts (New). At the same time, Parkinson went into the transaction owning a minority interest in Lammerts (Old) and came out with 100 percent of the common stock of Lammerts (New). Because of these substantial changes in the capital structure of the corporation, I do not believe that the transaction qualifies as "a mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)(F).

Furthermore, I view the distribution of the Ramp Garage property, the accounts receivable, and the shareholder loan to the estate as being an event which was separate and distinct from the reorganization transaction. While these two events (i.e., the dividend and the reorganization) occurred at the same time, they were functionally unrelated. *Reef Corporation* v. *Commissioner*, 368 F. 2d 125 (C.A. 5, 1966), affirming in part and reversing in part a Memorandum Opinion of this Court; and *Davant* v. *Commissioner, supra*. As the Fifth Circuit said in *Reef Corporation* v. *Commissioner, supra* at 134: "The test of whether events should be viewed separately or together as part of a single plan is not temporal but is functional." Applying this standard to the instant case, I fail to see how the dividend distribution can be said to be either necessary to or in any other way rationally related to the reorganization.

I am therefore constrained to conclude that the Ramp Garage property, the accounts receivable, and the shareholder loan, are taxable at ordinary income rates to the extent of earnings and profits as provided

under sections 301(a), 301(c), and 316. This conclusion is supported by section 1.301-1(1), Income Tax Regs., which provides:

(1) *Transactions treated as distributions.* A distribution to shareholders with respect to their stock is within the terms of section 301 although it takes place at the same time as another transaction if the distribution is in substance a separate transaction whether or not connected in a formal sense. This is most likely to occur in the case of a recapitalization, a reincorporation, or a merger of a corporation with a newly organized corporation having substantially no property. * * *

In light of my conclusion that the dividend distribution was functionally unrelated to the reorganization transaction, it of course follows that I believe that the "boot distribution" rules of section 356 are not applicable to this case.

DAWSON, *J.*, agrees with this dissent.