ESTATE OF BEN J. SLUTSKY, DECEASED, DONOR, JULIUS SLUTSKY, CO-EXECUTOR, ET AL [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Slutsky v. Commissioner
Docket Nos. 8843-79, 8844-79, 5168-82, 5169-82.
United States Tax Court
T.C. Memo 1983-578; 1983 Tax Ct. Memo LEXIS 208; 46 T.C.M. (CCH) 1423; T.C.M. (RIA) 83578; September 20, 1983. Joseph B. Murphy, for the petitioners in docket Nos. 8843-79 and 8844-79. Benjamin Lewis and Joseph Lapatin for the petitioners in docket Nos. 5168-82 and 5169-82. Bradford A. Johnson, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: By statutory notices of deficiency dated March 30, 1979, in *210 docket Nos. 8843-79 and 8844-79, and December 15, 1981, in docket Nos. 5168-82 and 5169-82, respondent determined deficiencies in Federal gift tax and additions to tax under section 6651(a) [2] as follows: Tax Period
Additions to Tax
Petitioner
Ended
Deficiency
Sec. 6651(a)
Estate of Ben J.
12/31/66
$1,136.46
$1,070.12
Slutsky, Deceased, Donor,
12/31/67
438.78
1,320.87
Julius Slutsky and Charles
12/31/68
34.79
1,620.61
Sltusky, Co-Executors
12/31/69
68.54
267.88
Docket No. 8843-79
12/31/70
6.08
240.11
12/31/71
900.43
6/30/72
405.00
102.38
3/31/73
405.00
102.38
6/30/73
6,040.13
1,852.21
9/30/73
900,929.91
225,285.68
3/31/74
3,199.82
895.59
9/30/74
487.49
135.94
12/31/74
975.00
271.88
3/31/75
390.00
108.75
6/30/75
975.00
271.88
Marion Slutsky
12/31/66
1,136.22
1,070.12
Docket No. 8844-79
12/31/67
438.78
1,320.87
12/31/68
34.78
1,620.71
12/31/69
68.55
267.89
12/31/70
6.08
240.11
12/31/71
900.43
Alice Slutsky
Docket No. 5168-82
9/30/73
492,229.60
123,057.40
Julius Slutsky
Docket No. 5169-82
9/30/73
492,229.60
123,057.40
*211 In an Amendment to Answer in docket No. 8843-79 filed April 8, 1981, respondent amended his determination of deficiencies for the taxable periods indicated as follows: Tax Period
Additions to Tax
Petitioner
Ended
Deficiency
Sec. 6651(a)
Estate of Ben J.
9/30/73
$1,206,586.91
$301,699.93
Slutsky, Deceased,
3/31/74
3,697.50
1,020.00
Donor, Julius Slutsky
9/30/74
543.74
150.00
and Charles Slutsky
12/31/74
1,087.50
300.00
Co-Executors
3/31/75
435.00
120.00
Docket No. 8843-79
6/30/75
1,087.50
300.00
By agreement of the parties and by order of the Court, these cases were consolidated for purposes of trial, briefing and opinion. The issues for determination are: (1) Whether petitioners' books and records related to gift tax returns filed by Marion Slutsky and on behalf of the Estate of Ben J. Slutsky for the years 1966 through 1970 and the quarter ending December 31, 1971, and on behalf of the Estate of Ben J. Slutsky for the quarters ending June 30, 1972, March 31, 1973, June 30, 1973, September 30, 1973, March 31, 1974, September 30, 1974, December 31, 1974, March 31, 1975, and June 30, 1975, were subjected to a second inspection *212 within the meaning of section 7605(b); (2) Whether Ben J. Slutsky made a gift of $15,000 to Charles Slutsky in 1966; (3) Whether certain lease and option agreements dated July 11, 1973, and July 16, 1973, respectively, constituted gifts by Ben J. and Julius Slutsky in favor of the lessees and grantees of those agreements; (4) If the 1973 agreements constituted gifts, what was the value of those gifts; and (5) Whether petitioners are subject to additions to tax under section 6651(a) as set forth in the notices of deficiency and amendment to answer. Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. For convenience and in order to avoid needless repetition of the facts, specific findings of fact and opinion relating to separate issues are combined under the appropriate heading. Ben J. Slutsky (Ben) died July 19, 1975. Petitioners Julius Slutsky (Julius) and Charles Slutsky (Charles) are the co-executors of Ben's estate. Julius resided in Ellenville, New York, at the time the petition in docket No. 8843-79 and filed. Charles, in his fiduciary capacity, filed gift *213 tax returns on April 15, 1976 on behalf of Ben's estate with George Goodman of the Newburgh, New York, Office of the Internal Revenue Service for the taxable periods ending June 30, 1972, March 31, 1973, June 30, 1973, September 30, 1973, March 31, 1974, September 30, 1974, December 31, 1974, March 31, 1975, and June 30, 1975. Julius, in his fiduciary capacity, filed gift tax returns on January 4, 1978, on behalf of Ben's estate with Mr. Goodman for the taxable periods ending December 31, 1966, December 31, 1967, December 31, 1968, December 31, 1969, December 31, 1970, and December 31, 1971. Petitioner Marion Slutsky (Marion) is the surviving spouse of Ben and resided in Sarasota, Florida, at the time her petition herein was filed. Marion filed gift tax returns with Mr. Goodman on January 4, 1978, for the taxable periods ending December 31, 1966, December 31, 1967, December 31, 1968, December 31, 1969, December 31, 1970, and December 31, 1971. Petitioners Julius Slutsky (Julius) and Alice Slutsky (Alice), husband and wife, resided in Ellenville, New York, at the time their petitions herein were filed. Julius and Alice each filed a gift tax return on November 3, 1981, for the *214 taxable period ending September 30, 1973 with the Appellate Division of the Internal Revenue Service, New Haven, Connecticut. Second Inspection (sec. 7605(b))
On April 19, 1976, an estate tax return (Form 706) was filed on behalf of the Estate of Ben Slutsky. George Goodman, an estate and gift tax examiner of the Newburgh, New York office of the Internal Revenue Service (the Service), was assigned to examine that return. During his review of books and records relating to Ben, Mr. Goodman concluded that Ben had made several gifts during the period 1966 through 1975 for which no gift tax returns had been filed. Mr. Goodman met with the attorney for the estate on several occasions and discussed what should be reported on the required gift tax returns and the amount of gift tax liability. As a result, the returns listed above were filed on behalf of Ben's estate. The determination of the Ben's gift tax liability was necessary in order to calculate the proper deduction on the estate tax return. Marion filed her returns for the sole purpose of electing gift-splitting under section 2513. As discussed in greater detail below, Ben and his brother, Julius, had entered into *215 a lease agreement and an option contract on July 11, 1973 and on July 16, 1973, respectively, with Ben's son, Charles, and Julius' sons, Jeffrey, Richard, and David Slutsky. Ben held an interest in the lease and the option at the date of his death. During his audit of the estate tax return, Mr. Goodman examined the value of the lease and the option, but he did not investigate the background details of those agreements to determine whether they were entered into for full and adequate consideration. On January 11, 1978, James Southgate, an estate and gift tax examiner of the Albany, New York, office of the Service, was assigned to audit the gift tax returns of Ben's estate and Marion filed as a result of the meetings between Mr. Goodman and the attorney for Ben's estate. In January 1973, Ben and Julius had each been convicted of evading individual income taxes for the years 1965, 1966, and 1967 in violation of section 7201. During the criminal investigation of Ben and Julius, several boxes of records were compiled by the Service. Mr. Southgate's examination consisted of reviewing tax returns and the criminal investigation records held by the Service, and he initially concluded *216 that minor mathematical errors had been made in some of these gift tax returns. His examination was subject to internal review, however, and after review he was instructed to further examine whether the gifts reported were correct. Mr. Southgate then wrote a letter to Joseph B. Murphy, counsel for Ben's estate and for Marion, requesting various items of information. Mr. Murphy objected to providing such items, however, on the grounds that Mr. Southgate's examination was a second inspection. Mr. Southgate did not obtain any books or records from petitioners or from their representatives. Based solely on his examination of records and returns in possession of the Service, Mr. Southgate concluded that Ben had made an unreported gift in 1966 of $15,000 to Charles, and that the lease and option agreements of July 1973 were both entered into for substantially less than their fair market value, thus constituting gifts to the lessees and grantees. These conclusions led to the notices of deficiency in issue in these consolidated cases. Petitioners argue that Mr. Goodman initially examined their books and records and that Mr. Southgate subsequently examined those same records without *217 obtaining the permission of the District Director of the Albany Office or the Commissioner of the Internal Revenue Service in violation of section 7605(b). That section provides: (b) Restrictions on Examination of Taxpayer.--No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary. Section 7605(b) contains two prohibitions. The first pertains to "unnecessary examination or investigations." The second prohibition pertains to an additional inspection of the taxpayer's books and records without giving prior written notice thereof. Petitioners claim respondent has violated the latter prohibition, thereby rendering his notices of deficiency in docket Nos. 8843-79 and 8844-79 invalid. Respondent argues that because Mr. Southgate's examination was limited to reviewing returns and records in possession of the Service, he did not inspect books and records of the taxpayer. Alternatively, respondent asserts *218 that Mr. Goodman's review of the books and records of petitioners for the purpose of assisting petitioners' representatives to prepare the returns did not constitute an "inspection" for purposes of section 7605(b). By its express terms, section 7605(b) restricts the number of inspections of a taxpayer's books and records. That section has no bearing upon respondent's authority to examine tax returns already in his possession or information procured by an agent of respondent on his initial inspection of taxpayer's books. See Pleasanton Gravel Co. v. Commissioner,64 T.C. 510, 528 (1975), affd. 578 F.2d 827 (9th Cir. 1978). [3] Mr. Southgate's examination was limited to reviewing tax returns and other information already in respondent's possession. Under these circumstances, no second inspection was made of any of petitioners' books. Transfer of $15,000
On October 31, 1966, Ben withdrew $15,000 from a savings account in Ben's and Julius' names and used that sum to obtain a cashier's check payable to his son, Charles. That check was used to secure a participating *219 interest in a mortgage loan to a corporation in St. Petersburg, Florida. Charles was one of the owners of that mortgage. Respondent determined that Ben made a gift of $15,000 to Charles and, because Ben and Marion elected to split their gifts for 1966, Ben's estate and Marion are both liable for the gift tax. Petitioners concede that due to the cumulative nature of the gift tax, our decision on this issue will affect their gift tax liability for subsequent taxable periods. Petitioners argue that there is insufficient evidence in the record to conclude that a gift had been made by Ben to Charles and that respondent's determination is arbitrary and capricious. Petitioners failed, however, to offer any explanation for the transfer of $15,000 from Ben to Charles. They note that the alleged donor, Ben, is now deceased and unavailable to testify, and argue that it is virtually impossible to prove a negative. Charles was not called to testify as to the reason for the transfer of the funds from Ben to him, however, and no explanation for his failure to testify has been provided. A statutory notice of deficiency is ordinarily presumed correct, and the taxpayer bears the burden of *220 persuasion (the ultimate burden) and of going forward with the evidence. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. It is undisputed that Ben transferred $15,000 to Charles, that the funds were used to purchase an interest in a mortgage, and that Charles was an owner of that mortgage. Respondent's determination is neither arbitrary nor capricious, and, in the absence of contrary evidence, must be sustained. The Lease and Option Agreements
In the early 1900's, Joseph and Yetta Slutsky, the parents of Ben and Julius, were among the many farming families in the Catskill region of New York who sought to supplement their income by taking in boarders during the summer months. Over a several-year period, many of these boarding houses added more and more amenities and eventually evolved into full-fledged hotels. These hotels were generally family operated and their success was attributable, in part, to the personal involvement of these families. The hotels essentially catered to people of the Jewish faith from the New York City area and provided kosher meals. The popularity of the area grew, and the *221 competition among these hotels became increasingly intense. Some of the hotels added improvements such as swimming pools and tennis courts, and the other hotels were forced to follow in order to remain competitive. As a result of this competition, only about a dozen kosher hotels in this region survived into the early 1970's. The Slutskys developed their boarding house into the Nevele Hotel, a year-round resort. Upon Joseph's death in 1958, Ben and Julius took over management of the Nevele and operated it as a partnership through 1973. On January 9, 1973, Ben and Julius were each found guilty of evading Federal individual income taxes for the years 1965, 1966, and 1967 in violation of section 7201.At that time Ben and Julius held a liquor license for the Nevele. Because of their convictions, the New York State Liquor Authority (NYSLA) scheduled a hearing in May of 1973 for the purpose of considering the revocation of that license.The NYSLA would have revoked that license if Ben and Julius had not sufficiently severed themselves from the control of the Nevele. Such a revocation would have severely affected the operation and value of the Nevele. In an attempt to appease *222 the NYSLA, Ben and Julius entered into an agreement to lease the Nevele Hotel to Ben's son, Charles, and to Julius' sons, Jeffrey, Richard, and David Slutsky on July 11, 1973.The lease was for a period of 21 years commencing on the earlier of September 4, 1973, or upon the approval of the transfer of the liquor license by the NYSLA. Annual rent was on a net, net basis (i.e., the lessees were to pay for all taxes, utilities, and insurance) as follows: Date
Amount
February 15
$ 50,000
May 15
50,000
July 15
50,000
August 15
100,000
September 15
100,000
Total Annual Rent
$350,000
No provision was made for increases in the lease payments for future years based on gross income or otherwise to account for inflation. The lessees were required to pay a noninterest-bearing deposit of $350,000, payable $100,000 immediately, $100,000 in 1 year, and $150,000 in 2 years. The lease also provided: It is specifically understood by and between the parties hereto that this Lease and all terms and provisions hereof are made subject to and conditional upon Lessee obtaining approval from the New York State Alcoholic Beverage Control Board of the transfer of the existing *223 hotel license or the issuance of a new license for the sale of alcoholic beverage[s] on said demised premises.Lessee represents that they shall make prompt application and diligently pursuit [sic] the obtaining of said approval.If said approval is not obtained within 90 days of the execution of this agreement then and in that event, Lessor, at Lessor's option, may deem the terms and provisions of this agreement null and void. The NYSLA was not satisfied, however, that the lease sufficiently severed Ben and Julius from the control of the Nevele. Ben and Julius then entered into an option agreement on July 16, 1973, granting to Charles, Jeffrey, Richard, and David the right to purchase the Nevele for $3,500,000, exercisable at any time during the period January 1, 1978, through January 1, 1979. Ben and Julius were paid a total of $1 by their sons as consideration for this option. The NYSLA was satisfied with the lease of July 11, 1973, coupled with the option dated July 16, 1973, and on or about November 7, 1973, issued a liquor license to Charles, Jeffrey, Richard, and David for operation of the Nevele. During the negotiations of the lease and option agreements, Ben and *224 Julius were represented by legal counsel.Neither Ben nor Julius were experienced at real estate appraisal, however, and the amount of the lease payments and the option price were determined without the aid of such an expert. The Nevele was not offered for sale to the public during 1973. At the time the lease and option agreements were executed, the Nevele was located on approximately 670 acres near Ellenville, New York. It consisted of several buildings of various ages that housed approximately 370 guest rooms, a 1,200-seat dining room, an 1,100-seat nightclub, a synagogue, coffee shop, meeting facilities, and a retail shopping arcade. Among the extensive recreational facilities were an 18-hole golf course, indoor and outdoor swimming pools, tennis courts, an ice skating rink, a lake, softball fields, a stable, and some facilities for snow skiing. The overall condition of the Nevele was excellent. Respondent determined that Ben and Julius executed the lease and option agreements in favor of their sons for substantially less than their fair market value and thereby made taxable gifts to them. Questions of valuation are inherently factual in nature, with the trier of fact *225 having the duty to weigh all relevant evidence of value and draw appropriate inferences. Hamm v. Commissioner,325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The value of the lease and option agreements, of course, depend on the value of the Nevele as of the date of their execution. A. Value of the Nevele Hotel
Each of the parties submitted a written appraisal of the Nevele Hotel as of July 11, 1973, and offered the testimony of their expert appraiser. As is too often the situation in valuation disputes, none of the approaches utilized by the experts in this case is entirely correct. As we stated in Messing v. Commissioner,48 T.C. 502, 512 (1967): Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations--a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise *226 and capable of resolution only by a Solomon-like pronouncement.See Commissioner v. Marshall,125 F.2d 943, 946 (C.A.2, 1942); Bosland, "Tax Valuation by Compromise," 19 Tax L. Rev. 77 (1963). With this inherent difficulty, the Court is required to examine all the factors considered by these experts, as well as their opinions of value. Walter Donnaruma prepared an appraisal on behalf of respondent and valued the Nevele at $9,000,000. Donnaruma has been in the appraisal business since 1947 and had previously appraised several resort hotels in the Catskill area. He is a member of the American Institute of Real Estate Appraisers (AIRA). Suzanne R. Mellen testified on behalf of petitioners Estate of Ben Slutsky and Marion Slutsky and valued the Nevele $3,400,000. Mellen is employed by Hospitality Valuation Services, Inc. (Hospitality) and prepared her appraisal in conjunction with Stephen Rushmore, the president of Hospitality, Rushmore is a member of AIRA and has authored a book entitled "The Valuation of Hotels and Motels." Alfred Schimmel testified on behalf of petitioners Julius and Alice Slutsky and valued the Nevele at $3,975,000. Schimmel *227 is a senior member and past president of the Greater New York Chapter of the American Society of Appraisers and has authored several articles on real estate appraisal. Schimmel was not engaged to appraise the Nevele until approximately one week before the trial, however, and much of his appraisal is based on his review of the Donnaruma and Mellen appraisals rather than on an independent investigation of the facts. The experts agreed that the use of the property in July of 1973 as a resort hotel was the highest and best use. The experts also agreed that because of the lack of sales of resort hotels similar to the Nevele in 1973, the only appropriate method of valuing the property was the income approach. Petitioners Julius and Alice argue, however, that, notwithstanding the opinions expressed by the experts, the best evidence of value is comparable sales. Each of the sales cited by petitioners was remote in time to the valuation date herein and involved either partial interests or stock restricted by agreement, and thus are of little relevance. We conclude that the only proper method of valuation under these facts is the income approach. [4] The components of that approach are *228 stabilized net income, available financing, and required return on equity. Donnaruma, Mellen, and Schimmel estimated the stabilized net income before allowance for management fees and a reserve for replacement to be $1,201,000, $1,078,000, and $1,030,000, respectively. Each of the experts based their estimates, in part, on information from prior tax returns (Forms 1065) of the Nevele for the years 1970-1973, and those returns are in the record. After reviewing all of the evidence, we find that the stabilized net income before allowance for management fees and a reserve for replacement should be $1,110,000. The management fee was estimated by Donnaruma at $40,000. Mellen's appraisal initially *229 omitted a management fee, but she testified at trial that an appropriate fee would be $165,900. Schimmel estimated a management expense of $160,000. Mellen's and Schimmel's estimates were based on 2-1/2 - 3 percent of gross revenue, a calculation recognized in various appraisal publications and in Donnaruma's testimony. Because of the size and complexity of the Nevele operations and giving consideration to the family-run history of the hotel, we conclude that an appropriate allowance for management fee is $160,000. The reserve for replacement was estimated by Donnaruma to be $100,000. Mellen did not include a reserve for replacement estimate in her stabilized net income calculation because she utilized a variation of the traditional income approach. (See Note 4, supra.) She testified at trial that an appropriate reserve would be $276,500 based on 5 percent of gross income. Schimmel estimated the reserve to be $250,000. David Slutsky testified that the actual cost of replacement for the years 1969 through 1973 was an average of $330,000. This calculation incorporates expenditures that would have been unascertained and therefore unavailable to a prospective purchaser in *230 July of 1973.The average actual cost of replacement utilizing David Slutsky's figures for 1970, 1971, and 1972 was approximately $208,500. Giving appropriate weight to each of the avove estimates, we find that the reserve for replacement should be $220,000. Based on the foregoing, we conclude that the appropriate stabilized not income is $730,000, calculated as follows: Stabilized Net Income Before
Management Fee and Reserve
$1,110,000 Management Fee
(160,000)
Reserve for Replacement
(220,000)
Stabilized Net Income
$ 730,000 The Donnaruma appraisal assumed that financial institutions would have offered a prospective purchaser of the Nevele in July of 1973 a mortgage loan of up to 70 percent of the fair market value of the property at an interest rate of 10 percent amortized over 20 years. Mellen's assumptions were remarkably similar, i.e., a mortgage of 75 percent of the value at 10-1/2 percent over 20 years. Both Donnaruma and Mellen utilized 1973 statistics to determine the financing terms. Schimmel assumed a mortgage of 60 percent of the value at 12 percent for 15 years, basing his estimate on data from 1965. In addition to the experts, David *231 Levinson, owner and operator of the nearby Tamarack Lodge, and David Slutsky testified as to financing of hotel improvements.Levinson stated that the Tamarack was able to obtain financing in 1962 to build an indoor pool at an interest rate of 7 percent amortized over 10 years. David Slutsky testified that the Nevele obtained a loan in 1976 for the purpose of constructing improvements on the property at an interest rate of 9 or 9-1/2 percent amortized over 15 years with a balloon payment of the balance after 5 years. The testimony of Schimmel, Levinson, and Slutsky was based on data remote in time to 1973. Also, the Levinson and Slutsky loans were for improvements rather than for the purchase of an entire property. The estimates of Donnaruma and Mellen were based on 1973 data and are therefore much more relevant. We conclude that a prospective purchaser of the Nevele in July of 1973 could have obtained financing for up to 70 percent of the value of the property at an interest rate of 10-1/2 percent amortized over 20 years. Donnaruma, Mellen and Schimmel assumed that a prospective purchaser of the Nevele would have required a return on his equity investment of 16 percent, 15 *232 percent, and 20 percent, respectively. The return available on AAA-rated corporate bonds in July of 1973 was approximately 7-1/2 percent. Considering the return available from relatively safe investments and the inherent risk and lack of liquidity facing a prospective purchaser, we find that a return on equity of 15 percent would have been required. The capitalization rate is computed as the weighted average of the returns commanded by the mortgage and equity funds.Using the component figures determined above, we conclude that the appropriate capitalization rate is.12886, calculated as follows: Mortgage
.70 X.1198 [5]
.08386
Equity
.30 X.15
.045
.12886
The value of the property may then be estimated by dividing the stabilized net income by the capitalization rate as follows: Stabilized net income
730,000
$5,665,063
Value of the Nevele Hotel
Capitalization rate
.12886
Petitioners argue that the value must be discounted because of a potential loss of the liquor license; the lack of adequate time to find a buyer; and because an outside purchaser *233 would not have the benefit of family management by the Slutskys. We are persuaded that the loss of its liquor license by the Nevele would affect its operations and reduce its value, and that the NYSLA would have revoked the license if Ben and Julius had not sufficiently severed themselves from the control of the Nevele. The record is void of any evidence, however, that it would have been difficult for a purchaser of the Nevele to obtain a liquor license. Charles, Jeffrey, Richard, and David Slutsky were able to obtain a liquor license in November of 1973 without any apparent difficulty. The necessity of transfer of the liquor license would be taken into account in any event of sale of the property. The subjective compulsion on the seller to sell is not ordinarily considered in valuing property. See sections 25.2512-1 and 25.2512-3, Gift Tax Regs. Accordingly, we decline to reduce the value of the property because of the potential loss of the Slutsky's liquor license. Fair market value assumes that the property will be exposed to the market place for a reasonable period of time. Petitioners assert that because the NYSLA was considering revoking their liquor license, Ben and *234 Julius did not have a reasonable period of time to transfer their interests in the property. They have presented no evidence, however, as to what would have been a reasonable period of time to sell the property or how long the NYSLA was willing to give Ben and Julius to dispose of their interests before revoking the license. Ben and Julius were convicted of a felony in January of 1973, the NYSLA scheduled a revocation hearing for May 3, 1973, and the lease and option were executed in July of 1973. The license was not transferred to Charles, Jeffrey, Richard, and David until on or about November 7, 1973, approximately 10 months after the conviction and approximately 6 months after the scheduled revocation hearing. Based on these limited facts, we cannot say that Ben and Julius did not have a reasonable period of time to transfer their interest in the property. The evidence supports petitioner's contention that an important factor in the success of the Catskill resort hotels was the family managing the hotel. This factor has already been considered, however, in our finding of stabilized net income (after adjustment for cost of management) and required return on equity. (If continuous *235 family management were not an important factor in determining the value of the property, a prospective purchaser would face less risk and would have required a slightly lower return on equity.) B. The Value of the Lease and the Option
The experts expressed the fair market value of the lease payments in terms of a percentage of the fair market value of the property subject to the lease. Schimmel estimated that the lease payments should be 10 percent of the value of the property. Donnaruma testified that a 10 percent return for the lessors was fair, but in his appraisal report he estimated that the appropriate return was 13.224 percent. We find that the fair rental value was 11-1/2 percent of the value of the property (i.e., an annual payment of $651,482). The lease of July 11, 1973, provided for payments of $350,000 per year, substantially less than the fair rental value of the Nevele. The value of an option depends on the estimated value of the property at the date it may be exercised. The option of July 16, 1973, was exercisable during the period January 1, 1978, through January 1, 1979. Unfortunately, the record is inadequate as to the amount of appreciation *236 or depreciation of the Nevele that could be expected between July of 1973 and the period during which the option could be exercised. We assume that the amount of expected appreciation would be offset by the expected gradual deterioration and obsolescence of the facilities, and the value of the property would remain approximately constant at $5,665,063, substantially more than the option exercise price of $3,500,000. The value of the option, therefore, was far in excess of the $1 paid for it. Petitioners argue that the value of the lease and the value of the option must be determined separately and that the value of the option must be discounted because the Nevele would be subject to a lease for approximately 15 years after the date of exercise.This argument has little merit where the lease and the option are held by the same persons. In any event, the gift tax is imposed on the total amount of taxable gifts made during the taxable quarter. See sections 2501 through 2503. Because we conclude, infra, that the lease and the option each constituted taxable gifts for the quarter ending September 30, 1973, their total value is the same whether they are valued separately or together. *237 For convenience, we value those agreements by comparing the total benefits to be received by the lessees/grantees with the total consideration required of them. The exercise price of the option contract was substantially less than the estimated value of the Nevele during the exercise period. We thus assume that the option would be exercised. Because the fair rental value of the Nevele was much greater than the required lease payments, and because the Nevele was not expected to appreciate during the exercise period, the lessees/grantees could maximize their return by exercising the option to purchase on the last possible date (i.e., January 1, 1979). Upon such exercise, Charles, Jeffrey, Richard, and David would be both the lessors and the lessees of the Nevele and, therefore, the fee owners of the property. We also assume that a typical arm's length lease would have required semi-annual payments on January 1, and July 1 of each year. Based on the foregoing, the fair market value of the benefits to be received and the consideration to be paid by the lessees/grantees may e summarized as follows: Actual Payments
FMV of Benefits
Under the Lease
Received Under the
Date
Description
and Option
Lease and Option
7/16/73
Payment for Option
$ 1
1/1/74
Fair Rental Value
$ 325,741
2/15/74
Lease Payment
50,000
5/15/74
Lease Payment
50,000
7/1/74
Fair Rental Value
325,741
7/15/74
Lease Payment
50,000
8/15/74
Lease Payment
100,000
9/15/74
Lease Payment
100,000
1/1/75
Fair Rental Value
325,741
2/15/74
Lease Payment
50,000
5/15/74
Lease Payment
50,000
7/1/75
Fair Rental Value
325,741
7/15/74
Lease Payment
50,000
8/15/75
Lease Payment
100,000
9/15/75
Lease Payment
100,000
1/1/76
Fair Rental Value
325,741
2/15/76
Lease Payment
50,000
5/15/76
Lease Payment
50,000
7/1/76
Fair Rental Value
325,741
7/15/76
Lease Payment
50,000
8/15/76
Lease Payment
100,000
9/15/76
Lease Payment
100,000
1/1/77
Fair Rental Value
325,741
2/15/77
Lease Payment
50,000
5/15/77
Lease Payment
50,000
7/1/77
Fair Rental Value
325,741
7/15/77
Lease Payment
50,000
8/15/77
Lease Payment
100,000
9/15/77
Lease Payment
100,000
1/1/78
Fair Rental Value
325,741
2/15/78
Lease Payment
50,000
5/15/78
Lease Payment
50,000
7/1/78
Fair Rental Value
325,741
7/15/78
Lease Payment
50,000
8/15/78
Lease Payment
100,000
9/15/78
Lease Payment
100,000
1/1/79
Option Exercise
Price
3,500,000
1/1/79
Fair Value of
Nevele
5,665,063
TOTAL
$5,250,001
$8,922,473
*238 The gross amount of the payments and benefits is not indicative of their true value, however, because they are paid or received over a period of time. The calculation of their true value requires that they be reduced to their present worth in July of 1973. "Present worth is that amount which prudent investors would be justified in paying for the privilege of collecting that future sum because the same result could be achieved by depositing the initial amount of the investment in an alternative account." Friedman, Encyclopedia of Real Estate Appraising, 51 (3d ed. 1978).Calculation of present worth depends on the discount factor chosen. The discount factor should reflect the return available on similar investments. On the entire record in this case, we find that the appropriate discount factor is 11-1/2 percent. Assuming the amounts and timing of the payments and benefits as set forth in the table above, we conclude that the excess of the present worth of those benefits over the present worth of the payments is $2,370,000, calculated as follows: Present Worth of Benefits at 11-1/2%
$5,582,000 Present Worth of Payments at 11-1/2%
(3,212,000)
Total Value of Gift
$2,370,000 *239 C. Deemed Gifts
"Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar quarter." Section 2512(b). The pertinent part of section 25.2512-8, Gift Tax Regs., provides, "a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from donative intent), will be considered as made for an adequate and full consideration in money or money's worth." Petitioners assert that the lease and the option were bona fide, arm's length transactions free from donative intent. In support of their claim that the transactions were bona fide, petitioners argue that they intended the transactions to be for full and adequate consideration, that they were represented by legal counsel during the negotiations, and that counsel never suggested that gifts may be involved.
The statute and regulations are to the effect that a gift may be inferred from the inadequacy of *240 consideration, regardless of the transferor's subjective intent, unless such inference is negated by the arm's length nature of the transaction. The transactions herein were between closely related parties, and as such are subject to rigid scrutiny. Mercil v. Commissioner,24 T.C. 1150, 1153 (1955). The required lease payments were substantially less than the fair rental value of the Nevele and they were determined without the benefit of an expert appraiser. The fact that legal counsel prepared the agreements and may not have alerted petitioners that a gift tax liability may exist is not persuasive as to whether the transactions were made at arm's length.We conclude that the lease constitutes a taxable gift. Petitioners contend that the lease was subject to a condition precedent (i.e., the granting of a liquor license to the lessees) that was not satisfied until November of 1973. They argue that even if the lease did constitute a gift, it was not a gift until after the taxable period ending September 30, 1973, a period not covered by the notices of deficiency. As authority for their position, petitioners cite Dresselhuys v. Commissioner,40 B.T.A. 30 (1939); *241 Tennyson v. United States, an unreported case ( W.D. Ark. 1976, 76-1 USTC par. 13,128, 37 AFTR2d 76-1546), and Burnett v. Guggenheim,288 U.S. 280 (1933).These cases are distinguishable, however, from the one before us. In Dresselhuys, the transferor made a transfer in trust for the benefit of a minor to take effect only if the transferor's husband delivered a letter of consent to the trustee. In Tennyson, the purported transferor merely executed an agreement promising to make a gift in the future. In Burnet v. Guggenheim,supra, the transferor made transfers to two trusts reserving the unrestricted power to modify or revoke those trusts. In each of these cases the condition that prevented the transaction from being a completed gift at the time the transfer was made was in the control of the transferor or a party within the transferor's immediate sphere of influence. Under the circumstances found here, the rights of the lessors and lessees were fixed at the time the lease was executed. The lessees were obligated to make a prompt and diligent effort to obtain a liquor license. Only if such license were not obtained *242 by the lessees within 90 days, a condition beyond the control of the lessors, did the lessors have the authority to void the agreement.Because the lessors did not retain control of the transfer under the terms of the lease, the gift was made as of the date the lease was executed. See section 25.2511-2(b), Gift Tax Regs. The consideration paid for the option contract was similarly much less than the value of that contract. The effect of the option was to transfer to the grantees the right to purchase the Nevele approximately 5 years in the future for $3,500,000 at a time when the projected value of that property would be $5,655,063. The grantees stood to benefit additionally from any unexpected appreciation, and their only risk from unexpected depreciation was the loss of $1.The exercise price and the amount of consideration paid for the option were determined without the benefit of an expert appraiser. Under these facts, petitioners have failed to prove that the option agreement was an arm's length transaction.
The lease and option transactions, therefore, together resulted in a taxable gift in the value of $2,370,000, of which one-half is attributable to Julius and Alice and *243 one-half is attributable to Ben's estate. Additions to Tax (sec. 6651(a))
Excluding the gifts at issue herein, Ben made transfers of cash, stock and real property totaling $447,737 during the period 1966 through 1975. No gift tax returns were filed for these transfers, however, until after the Service began its examination of the estate tax liability of Ben's estate in 1976. Julius, as fiduciary, and Marion elected to treat the gifts made by Ben during the period 1966 through 1971 as if one-half had been made by each of them under the provisions of section 2513. The transfers made by Ben and the gift tax returns filed on behalf of Ben's estate and by Marion may be summarized as follows: Date
Tax Period
Donor
Filed
Ended
Description
Value
Ben
1/4/78
12/31/66
Stock
* $103,068
Ben
1/4/78
12/31/67
Stock
* 60,980
Ben
1/4/78
12/31/68
Stock
* 67,410
Ben
1/4/78
12/31/69
Stock
* 15,552
Ben
1/4/78
12/31/70
Stock
* 14,537
Ben
1/4/78
12/31/71
Stock
* 38,015
Ben
4/15/76
6/30/72
Cash
5,000
Ben
4/15/76
3/31/73
Cash
5,000
Ben
4/15/76
6/30/73
Residence
90,675
Ben
4/15/76
9/30/73
Cash
10,000
Ben
4/15/76
3/31/74
Cash
20,000
Ben
4/15/76
9/30/74
Cash
2,500
Ben
4/15/76
12/31/74
Cash
5,000
Ben
4/15/76
3/31/75
Cash
5,000
Ben
4/15/76
6/30/75
Cash
5,000
Total
$447,737
*244 Respondent determined that these gift tax returns were not timely filed and determined additions to tax under section 6651(a).
Julius reported the option agreement executed in July of 1973 as a gift of $1,000. He and Alice elected to split the gift under section 2513, but their gift tax returns were not filed until 1981. Respondent determined that these returns were not timely filed and determined additions to tax under section 6651(a). Section 6651(a)(1) provides: (a) Addition to the Tex.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine gunds and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, *245 there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. [Emphasis supplied.] Petitioners admit that the gift tax returns at issue herein were not timely filed, but claim that such failure was due to a "reasonable cause." In addition, counsel for Ben's estate and for Marion asserts that neither Ben nor Marion "willfully neglected" to file their returns.
It is argued on behalf of Ben's estate and Marion that additions to tax should not apply because their gift tax returns were filed voluntarily, citing Fajardo Sugar Co. of Porto Rico v. Commissioner,20 B.T.A. 980 (1930); neither Ben nor Marion had knowledge of the existence of gift tax laws and, therefore, they could not have willfully neglected to file returns that they did not know were required; and Marion had no knowledge that Ben had made any gifts during the period 1966 through 1971. In Fajardo, a foreign corporation with a place of business *246 in the United States failed to timely file a return because its officers believed it had no taxable income. One of the officers subsequently determined that a return was required and, "without demand or suggestion from the collector or other Federal tax officer," filed a return on behalf of the corporation. [Emphasis supplied.] Fajardo,20 B.T.A. at 984. Under those circumstances, the Board held that an addition to tax should not be imposed. The Fajardo case is distinguishable, however, from the facts herein. Each of the gift tax returns here at issue were filed only after the Service began to investigate the estate tax liability of Ben's estate, and not without the intervention of a Federal estate and gift tax examiner. Petitioners' next argument, that neither Ben nor Marion were aware of the gift tax laws, is not supported by the record. The record contains no reference to Ben's or Marion's knowledge or lack thereof regarding gift tax laws. Marion did not testify at trial and her argument that she was unaware of gifts made by Ben is similarly unsupported by the record. In any event, neither ignorance nor honest belief relieves the obligation to *247 file or constitutes reasonable cause for failure to file. See Estate of Lammerts v. Commissioner,456 F.2d 681 (2d. Cir. 1972), affg. on this issue and remanding on another 54 T.C. 420 (1970); Adams v. Commissioner,46 T.C. 352, 363 (1966). Petitioners bear the burden of proof on the issue of section 6651(a) additions to tax. See Fischer v. Commissioner,50 T.C. 164, 177 (1968). We find that petitioners Estate of Ben Slutsky and Marion have not met this burden and, therefore, are subject to additions to tax for each of their gift tax returns at issue herein. (In any event, because Ben made gifts of $103,068 of stock and $10,000 cash for the taxable periods ending December 31, 1966, and September 30, 1973, respectively, gift tax returns were required for those periods.) Petitioners Julius and Alice argue that they reasonably believed that the lease and option agreements of July 1973, were entered into for fair value and that no gifts had been made. In support of their position, they claim that they were represented by legal counsel during the negotiations of those agreements, that counsel never informed them that *248 a gift tax return may be required, and that at least one of the expert appraisers agreed with their valuation of those agreements. Where a taxpayer seeks advice from a competent tax expert, supplies him with all the necessary information, and requests him to prepare proper tax returns, the failure to timely file a return may be due to a reasonable cause. See Hatwood Lumber & Mining Co. v. Commissioner,178 F.2d 769, 771 (2d Cir. 1950), revg. on this issue 12 T.C. 735 (1949). On the other hand, in the absence of such advice, mere mistaken belief that no tax was due is not reasonable cause. Heman v. Commissioner,32 T.C. 479, 490 (1959), affd. 283 F.2d 227 (8th Cir. 1960).Although petitioners were represented by legal counsel during the negotiations of the lease and option agreements, there is no evidence that such counsel was competent in tax matters, that counsel was supplied with the necessary information to determine whether a gift may have been made, or that counsel was requested to provide tax advice regarding those agreements. The failure of counsel to advise that a gift tax return may be required under the above *249 circumstances is not a reasonable cause for failure to file such a return. Julius' and Alice's next argument, that at least one of the experts agreed with their valuation of the lease and option, is equally without merit.Although neither Julius nor Ben was an expert at real estate appraisal, no such expert was consulted during the negotiations of those agreements. Thus, it cannot be said that they relied on the advice of experts. Further, the amount of the lease payments was not consistent with the opinion of any expert as to rental value. Donnaruma and Schimmel determined that the fair annual rental value of the Nevele was $1,190,000 and $397,500, respectively, substantially greater than the required annual lease payments of $350,000. (Mellen did not appraise the fair annual rental value of the Nevele.) Based on the fact that Julius and Ben did not consult an expert appraiser and negotiated a lease payment that was substantially less than the fair rental value of the property in favor of their sons, we conclude that Julius and Alice have failed to satisfy their burden of proving that they had reasonable cause for their failure to file gift tax returns for the taxable period *250 ending September 30, 1973. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Marion Slutsky, Donor, docket No. 8844-79; Alice Slutsky, Donor, docket No. 5168-82; and Julius Slutsky, Donor, docket No. 5169-82.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. See also Jackson v. Commissioner,T.C. Memo. 1982-556↩.
4. The Donnaruma and Mellen appraisals applied variations of the traditional income approach. Donnaruma utilized the Ellwood Method, a method first used in the early 1970s. Mellen first determined the value of the property by using the income approach, and then reduced that value by the full amount of upgrading expected to be required of the property in future years, without adjusting the cost of future upgrading to its then present value. We adopt the traditional income approach.↩
5. 1198 is the mortgage constant for a 20-year mortgage at 10-1/2 percent.↩
*. Returns were filed on behalf of Ben's estate and by Marion electing to split these gifts.↩